UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-80611-CIV-ALTMAN/Reinhart

MARCELLUS WILLS,

     *Plaintiff*,

*v.*

WALMART ASSOCIATES, INC.,

     *Defendant*.

_____/

<u>**ORDER**</u>

Marcellus Wills, a store manager at Walmart, demonstrated an unacceptable tendency to yell at the women who worked for him—often in front of others, sometimes in the presence of awe-struck customers. Once, he screamed at an older female employee on the salesfloor—spewing expletives (like "fuck")—as several customers watched in horror. An unrelated Walmart employee who witnessed this incident would later write that Wills had treated the woman "[like] less than a person." Anxious and disenchanted, the woman stepped down from her role at Walmart. Another time, he berated a different female subordinate, throwing merchandise angrily at the ground and shouting with "nothing but total anger in his voice." In her deposition, this woman would testify that "I have never been so humiliated." After Wills abused this woman a second time, she pulled a supervisor aside and asked helplessly: "What can I do?" A third woman recounted how Wills "blew up" at her because of a mess he'd observed in her part of the store. A fourth woman complained that she found Wills threatening, but she refused to file a written complaint because she was afraid that he'd retaliate against her. A fifth person called Walmart's anonymous ethics hotline and reported that Wills was a bully. And several other employees said that Wills had warned them against complaining about him (or "his store") to management. Unsurprisingly, when Walmart heard about all this, it fired him.

Naturally, Wills responded by blaming (and suing) Walmart for his troubles. In this lawsuit, Wills claims that he was terminated—not for his egregious workplace misconduct—but because he took a few weeks of FMLA leave and because he is black. But no reasonable jury would agree with him. Walmart, after all, *granted* Wills's requests for FMLA leave *in full*, and there's no evidence that Wills's termination had anything to do with that leave. As for Wills's race, although Wills testified that his market manager subjected him to some harsh treatment (which included, among other things, a few racially-tinged comments), Wills hasn't tied his market manager's views on race (whatever they were) to his termination—which, as we'll soon see, resulted from an entirely *separate* investigation, conducted by a *different* supervisor, into Wills's aggressive behavior towards women. Walmart's motion for summary judgment is **GRANTED**.

## THE FACTS[1]

Marcellus Wills started working at Walmart in 2010 as a customer service manager. *See* Defendant's Statement of Material Facts [ECF No. 54] ("Defendant's SOF") ¶ 1; Plaintiff's Response Statement of Material Facts [ECF No. 75] ("Plaintiff's SOF") ¶ 1 ("Undisputed."). Over the years, Wills moved up the ranks: first to assistant manager, then to co-manager, and finally (in 2015) to store manager. Defendant's SOF ¶ 1; Plaintiff's SOF ¶ 1 ("Undisputed."). Wills's store was in the geographic region Walmart called "Market 108," which encompassed eleven stores across South Florida—from Palm Springs to Pompano Beach. Defendant's SOF ¶ 1; Plaintiff's SOF ¶ 1 ("Undisputed."). Wills is black. Defendant's SOF ¶ 1; Plaintiff's SOF ¶ 1 ("Undisputed.").

---

[1] "The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant].").

In June 2018, three or so years into Wills's tenure as store manager, James Reinard (who's white) took over as market manager of Market 108—becoming Wills's direct supervisor. *See* Defendant's SOF ¶¶ 1–2; Plaintiff's SOF ¶¶ 1–2 ("Undisputed."). When Reinard stepped in, *his* supervisor—regional general manager Jaime Fernandez—assigned him the task of lifting his stores' "operational standards." Defendant's SOF ¶ 3; Plaintiff's SOF ¶ 3 ("Undisputed."); *see also* Deposition of Jaime Fernandez [ECF No. 54-3] ("Fernandez Depo.") at 50:7–11 ("So, Jimmy [Reinard] went into the market and he was assigned on market to raise the standards. Because we had a, you know, a good group of stores that were not, where they should be from an operational standards standpoint.").

Wills felt the shift. As Wills testified, "[i]t was just almost as if [Reinard] was just trying to set a tone with us. A very stern tone in the way of, you know, getting -- like me to get your you know, you need to get your you know, your stores together because they are mediocre." Deposition of Marcellus Wills [ECF No. 54-1] ("Wills Depo.") at 42:10–17. And Wills didn't respond well to these changes. Wills "hated the change initiatives; he was very vocal against things like that. Negative body language -- disruptive sometimes with outbursts." Deposition of James Reinard [ECF No. 54-2] ("Reinard Depo.") at 13:11–14.

Despite Wills's objections, Reinard didn't view Wills as a "problem"—at least not yet. Plaintiff's SOF ¶ 5; *see also* Reinard Depo. at 19:13–17 (Reinard testifying that he "thought [he] could train [Wills's unprofessional conduct] out of him and develop [him]"). In September 2018, in fact, months after taking the market-manager position, Reinard viewed Wills as a promising candidate for promotion. *Id.* at 18:12–13 ("Q: And why were you offering him a promotion? A: Because he did a good job."). The promotion was for a store-manager position at a higher-volume store—a position that offered a higher salary and a bigger bonus structure. Defendant's SOF ¶ 6; Plaintiff's SOF ¶ 6

(not disputing this point); *see also* Reinard Depo. at 18:3–8 ("[I]t would be a promotion, it would be more money. A bigger bonus structure. It would be a good opportunity for him to take on a more . . . challenging store.").

Reinard took Wills to lunch at Troy's BBQ to offer him the position. As Wills put it, "[we] went to lunch at Troy's BBQ," and Reinard "tried to pressure me into taking a store manager position at a different location[.]" Pl.'s Resp. to Def.'s Interrogs. [ECF No. 57-1] ("Interrogatories") at 4; *see also* Wills Depo. at 55:21–24 ("[H]e was . . . trying to pressure me into taking the -- the store manager position at Pompano Beach Florida[.]"). Although Reinard was pushing to *promote* Wills to a better role with better pay, Wills testified that Reinard's offer was speckled with racial undertones. Here's Wills's description of that conversation:

> So again, when James Reinard made the comments to me as far as that I needed to conform as a black man and I felt -- again, I -- I felt a high sense of -- of fear intentionally coming from him because, again, he made the comment that as a black man, I needed to conform and I needed to prove myself to him and [regional manager] Jaime [Fernandez]. And he said, you know, for me proving myself to him and Jaime, you know, that's how I could be in the inner circle of trust. And he said that the only thing that matters to him is what his -- his manager thinks, which is Jaime -- what Jaime thought about him as well.
>
> From that comment, he then also how he described and talked about his previous associates, saying that they really didn't matter. He knew that they didn't like him and that they hated him and so what, he was still able to get promoted. And he made the -- the comment as well like, you know, it's about who you know, and, you know, those relationships. Again, that was something that I wasn't used to hearing. And when -- when he was saying those comments and trying to pressure me into taking the -- the store manager position at Pompano Beach Florida, 1517, when [Warren] Wright was fired, I felt very, very scared.

Wills Depo. at 55:11–25.

While he didn't say so in his deposition, Wills attested elsewhere that Reinard told him, during that lunch, that Reinard's "former *black* associates . . . did not like him [Reinard]," but that he didn't

care about "those people." Interrogatories at 4 (emphasis added). "After this conversation," Wills "felt extremely uncomfortable around Mr. Reinard[.]" *Id.* Wills also testified that he was "taken aback" by the job offer "as far as, you know, yes, he was offering the position, but I didn't formally go through [the hiring] process [for the promotion]." Wills Depo. at 58:19–59:2.

Wills ultimately turned down the promotion. Wills testified that, "[t]he next day, [Reinard] called me that morning, and he told me that he was going into a meeting with Jaime and that he was you know, he said, 'I want to know now what is your decision.'" *Id.* at 56:5–9. In response, Wills told Reinard: "I kindly decline[.] I -- I can't take this store." *Id.* at 56:10–11. Reinard didn't take this well. According to Wills, Reinard "began shouting that, you know you know, '[p]eople like you won't get an opportunity like this and, you know, you're' – 'you are going to' – 'you know, you are going to regret, you know, not taking this opportunity.'" *Id.* at 56:12–17. Wills testified that Reinard then "hung up the phone on [him]." Interrogatories at 4.

Wills's relationship with Reinard devolved from there. On the day after Thanksgiving, for instance, two months after Wills turned down the promotion, they had an argument about the state of the store. When Reinard walked in, the salesfloor was—as Wills paints it—something of a mess: "[A]t this point, I -- the previous day, I worked about 14 hours and came right into my store that morning and started to try to put the store back together. And so we have to move pallets around and put the apparel racks back together." Wills Depo. at 150:4–10. Seeing this, Reinard went up to Wills and "beg[a]n to yell and shout at him on the sales floor right near the front end between apparel," saying (at one point): "Are you stupid or slow of understanding what I want and what the company wants?" Plaintiff's SOF ¶ 18. Wills says that he and Reinard then went outside, where Wills "voiced his concerns to Reinard and told him that he will be reporting this issue to his superior, Jaime

Fernandez." *Id.*[2] Reinard responded with some bravado: "go head Jaime won't do anything, look what happen to Warren Wright." *Id.* (errors in original).

Weeks after this Thanksgiving showdown, Wills had a family emergency and needed to take leave. Specifically, on the afternoon of December 14, 2018, Wills got a phone call from his brother. *See* Defendant's SOF ¶ 9; Plaintiff's SOF ¶ 9 ("Undisputed."). Their father, Wills's brother said, had suffered a heart attack. Defendant's SOF ¶ 9; Plaintiff's SOF ¶ 9 ("Undisputed."). Wills called Reinard twice on Friday afternoon to tell him about this emergency, but Reinard missed both calls. *See* Defendant's SOF ¶ 10; Plaintiff's SOF ¶ 10 ("Undisputed."). Wills also sent Reinard a text message the next day. Defendant's SOF ¶ 12; Plaintiff's SOF ¶ 12 ("Undisputed."). But, before Reinard responded, Wills drafted a long email to Fernandez (the regional general manager) and Glenda Fleming (the divisional operations director)—Reinard's boss and Reinard's boss's boss, respectively. Defendant's SOF ¶¶ 11–12; Plaintiff's SOF ¶¶ 11–12 ("Undisputed.").

In that email, Wills noted that "over the last couple years but especially this fiscal year you can see the dynamics have really change[d] drastically" in that "[p]eople feel a real disconnection from the top leadership to the field operators." Email from Wills to Fernandez and Fleming (Dec. 16, 2018) [ECF No. 54-1-3]. "I do not believe nor feel," Wills wrote, "that the company cares about me or my

---

[2] Wills never says what these "concerns" were. To the extent the answer lies buried somewhere beneath our (vast) summary-judgment record, it was undoubtedly *Wills's* obligation (not ours) to dig it out. *See, e.g.*, *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that the district court has no independent obligation to "mine the record"); *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1209 n.11 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (Easterbrook, J.) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

family." *Id.* Wills pointed out, for example, that he "reached out to [his] market manager yesterday to tell him that [his] father just had this extraordinary situation just happen to him and [he] did not receive any communication from Jimmy [Reinard]." *Id.* Wills felt that Reinard's failure to ask about his father "is very important because this goes to the route of the problem"—which was, as Wills saw it, "[t]he culture of fear that has been created inside the work environment[.]" *Id.* "Throughout this year I cannot tell the countless times I have heard my job and other store manager jobs are on the line for a array things[.]" *Id.* (errors in original).[3]

Fleming wrote back to Wills later that day. *Id.* She said: "I am so sorry to hear about your father[.] [M]y thoughts and prayers are with [you] and your father." *Id.* Fleming also told Wills that "we certainly do not want you to feel this type of pressure" and assured Wills that she "did hear your name mentioned several times from [Reinard] who was praising your performance." *Id.* She signed off by promising that "Jaime [Fernandez] or myself will followup [sic] with you this week." *Id.* Fernandez did follow up with Wills, as promised. *See* Wills Depo. at 68:8–19. Wills testified that Fernandez called Wills while he was out on leave to talk about Wills's email, and that—during that call—Wills "brought up the example of when . . . James Reinard made a remark about me conforming as a black man" and how, "before Warren Wright was fired, [Wright] was making comments saying that he felt that Jimmy was targeting him, bullying him[.]" *Id.* at 71:1–11. Walmart *fully* approved Wills's leave request. *See* Defendant's SOF ¶ 19; Plaintiff's SOF ¶ 19 ("Undisputed."). Wills went on leave for about two

---

[3] At his deposition, Wills expanded on these comments. He explained that the other store managers whose jobs were on the line included Eric Garner (a white man) and Roberto (a latino man). *See* Wills Depo. at 80:15–81:19; *see also* Plaintiff's SOF ¶ 14 (contending only that "[m]ost of the store managers" Wills was referring to "are black"). Still, Wills suggested that the "culture of fear" he mentioned in his email "specifically related to leadership discriminating against black employees." *Id.*

weeks—from December 17, 2018, through January 3, 2019. Defendant's SOF ¶ 19; Plaintiff's SOF ¶ 19 ("Undisputed.").

Wills says that he had a similarly troubling encounter with Reinard in February 2019—about a month after he returned from his leave. Wills Depo. at 154:22–25. Wills testified that, one day, Reinard and Tammy Steele—Walmart's human resources manager for Wills's market—"brought [him] to the market office" to talk. *Id.* When Wills arrived, Reinard and Steele (who is herself black) "closed the door, and they said that -- you know, 'Jaime [Fernandez], you know, told us the issues and concerns that you have in the market.'" *Id.* at 154:25–155:3. Reinard then "began to go into that he doesn't feel that there's any issues in the market, that he feels that, you know, there's no -- the only issue in the market is me not being a team player." *Id.* at 155:6–10. According to Wills, Reinard then said:

> [Y]ou know, "I keep seeing that you and the Black store managers are, you know, always walking together like a clique, and it's just rubbing some of the other store managers which were not Black store managers the wrong way," and I needed to be a cheerleader for the team and I needed to get my act in order.

*Id.* at 155:10–16. And, when he made that comment (about the clique), "you can almost see Tammy's face kind of perk up because I could tell that the HR person, she probably would have advised him not to do that -- not to say that." *Id.* at 155:17–21. Wills says that, at this meeting, he brought up "disparate treatment"—mostly from Reinard. Plaintiff's SOF ¶ 84.

On February 26, 2019, several weeks after this meeting with Reinard and Steele, Wills had a disagreement with management about his annual bonus—a disagreement that, he insists, was racially motivated. *See* Defendant's SOF ¶ 32 (noting that Walmart gave Wills his bonus information on February 26, 2019); Plaintiff's SOF ¶ 32 ("Undisputed."). A store manager's bonus is based on three things: (1) profit; (2) gross sales; and (3) customer satisfaction, which is measured by the scores of the

Clean Fresh Fast ("CFF") customer survey. Defendant's SOF ¶ 32; Plaintiff's SOF ¶ 32 ("Undisputed."). When he received his bonus information, Wills learned that, although he'd be receiving bonuses for meeting his profit and sales goals, his store's CFF scores had fallen below the bonus threshold, so he wouldn't be receiving an *additional* CFF bonus. Defendant's SOF ¶ 32; Plaintiff's SOF ¶ 32 ("Undisputed."). In other words, although he did receive a bonus of $68,000 for profits and sales, he didn't get a $13,000 CFF bonus. *See* Wills Depo. at 226:1–4 ("Q: When you say that the bonus could have been 81,000, are you saying that you did receive some of that bonus but you lost $13,000? A: Yes, sir.").

Wills claims that he didn't get his CFF bonus—not because he fell short of Walmart's objective criteria—but because he is black. To support this conclusion, Wills invokes his regional manager's testimony that "Market Managers, like Reinard, can recommend that exceptions be granted to stores and managers who fail to meet certain bonus metrics for excusable reasons such as the store being remodeled." Plaintiff's SOF ¶ 36 (citing Fernandez Depo. at 40:15–41:2, 43:2–44:15). And he claims that "Reinard granted exceptions to white managers in his market such as Neil Manusa and Michael Gillespie, but [that Wills] did not receive any exception even though his store also underwent some remodeling." *Id.* The problem is that the testimony Wills cites for this proposition *actually* says just the opposite. As Fernandez explained:

> Q: Do you know if Jimmy Re[i]nard has any ability to give an exception to store managers if the store is under kind of, any kind of where they're redoing the store for some reason?
>
> A: He can recommend there's an exceptions process, but it's based on sales and profit. So, if a store, there was a specific reason why it didn't meet its sales performance, it can be reviewed, they can recommend, I can review it, if I concur. I can recommend it up to the divisional level. The next level and then they review it and they either approve it or not, but ultimately, I believe it gets approved by our CEO.

Q: And do you know if Marcellus' store was under repair, redone in any way where he could have received an exception?

A: No. It -- I mean you can't file an exception based on CFF. If the data is wrong, what's in the system as it relates to the CFF, it can certainly be reviewed. And -- but that's not an exception, it's going back to the company and saying the payout is wrong. Here's the correct CFF data. The CFF data [for Wills's store] was substantiated that it was correct. So, the -- so there is no exception on that one. The other process on exception is you have to meet a certain criteria. So, if a -- *if a store didn't get any type of bonus*, but their sales were greatly impacted for a reason there is an exception process, but [Wills's] store did get a -- get a bonus. . . . Again, if the store, there's the exception process, is based on stores that *do not receive any type of bonus, zero bonus*.

Q : Okay.

A: That's when the exception process can come in. His store did get it, he got a bonus. He hit sales and profit. *So, automatically, he does not qualify for an exception process because he got a bonus*. The exception process is for a store that qualifies for zero bonus. So, in that, if he would have received zero, because, "Hey, I went for remodel and my sales got greatly impacted and therefore I got zero bonus" we can review that, but he did get a bonus.

Fernandez Depo. at 40:15–43:1 (emphases added). In other words, under Walmart's procedures, a market manager can recommend an exception only where a store manager receives *no bonus*—not where store managers (like Wills) *did* receive a bonus.[4]

On March 20, 2019, after the bonus disagreement, Wills submitted an online complaint to Walmart's global ethics hotline. *See* Marcellus Wills Global Ethics Complaint (Mar. 20, 2019) [ECF No. 54-1-8]. In his complaint, Wills said that "[o]ver the past few weeks it has felt as if there has been retaliation against me for speaking up about a culture of fear that exist in my market." *Id.* (errors in

---

[4] Note that this theory wouldn't help Wills *even if* Fernandez were wrong—that is, even if Reinard *could* have recommended an exception for stores that *did* receive a bonus. And that's because, in that scenario, Wills wouldn't be able to show that he was similarly situated to Neil Manusa and Michael Gillespie. Their stores, after all—unlike Wills's—received *no* bonuses (apparently, for reasons outside their control), which would be cause enough for Walmart to treat them more leniently than it treated Wills.

original). He pointed specifically to the bonus he didn't get for "not meeting CFF goals." *Id.* And he surmised that "[t]his issue feels like I was retaliated against due to me speaking up about concerns taking place in the work environment." *Id.*

After receiving Wills's complaint, the ethics intake manager concluded that Wills hadn't given enough information for the manager to determine whether an ethics violation had occurred. *See* Defendant's SOF ¶ 38; Plaintiff's SOF ¶ 38 ("Undisputed."). As a result, the associate relations team followed up with Wills via email on March 26, 2019—six days after he filed his complaint—informing him that "more specific information is needed." Defendant's SOF ¶ 38; Plaintiff's SOF ¶ 38 ("Undisputed."). Wills didn't respond to this email because, on the same day that associate relations emailed him, Wills applied for leave (beginning the next day) to deal with his recurrent depression and acute stress disorder. Defendant's SOF ¶¶ 39–40; Plaintiff's SOF ¶¶ 39–40 ("Undisputed."). Again, Wills's request for FMLA leave was *fully* approved. Defendant's SOF ¶¶ 39–40; Plaintiff's SOF ¶¶ 39–40 ("Undisputed.").

But this timeline, which comes mostly from Wills, doesn't tell the whole story—because, between January 2019 (when Wills first returned from leave after his father's heart attack) and March 2019 (when he asked for a second round of leave to address his own mental health), Walmart started receiving tips that Wills was mistreating his female associates. In late January 2019—shortly after Wills first returned from leave—Walmart's global ethics hotline took an anonymous call from an associate at Wills's store, reporting that Wills was a bully and that he was exhibiting favoritism towards certain

associates. *See* Decl. of Tammy Steele [ECF No. 61-1] ("Steele Decl.") ¶ 3.[5] Around that same time,

Wills "blew up" at Jennifer Sears on the salesfloor. Deposition of Jennifer Sears [ECF No. 54-5]

---

[5]     In a half-hearted attempt to conjure up a genuine dispute, Wills contends that the anonymous tip "is inadmissible hearsay, and even if it is admissible, Defendant admits that any allegations were unsubstantiated." Plaintiff's SOF ¶ 20. Both arguments are misplaced.

*First*, the employee's anonymous complaint isn't hearsay. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c); *see also Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 910 (11th Cir. 2012) ("Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement . . . and is generally not admissible except as provided in the Rules of Evidence or a federal statute[.]"). But Walmart doesn't rely on the anonymous tip to prove the truth of the matter asserted—*i.e.*, that Wills *in fact* bullied a coworker. Instead, Walmart uses the tip to explain why Walmart *believed* that Wills *might* have bullied a coworker—a belief that, for reasons having nothing to do with race, sheds light on Walmart's decision to investigate Wills further. *See, e.g.*, *Jefferson v. Burger King Corp.*, 505 F. App'x 830, 836 (11th Cir. 2013) ("Burger King asserts that [the plaintiff] was terminated for creating a hostile work environment and presented thirteen handwritten complaints from employees about [the plaintiff]. [The plaintiff] claims that the employee complaints are hearsay. However, these complaints are not hearsay because they were not offered for the truth of the matter asserted; instead, they were offered only to establish that Burger King had legitimate, non-discriminatory reasons for terminating [the plaintiff's] employment."); *Goode v. Wild Wing Cafe*, 588 F. App'x 870, 874–75 (11th Cir. 2014) (rejecting the plaintiff's "frivolous[]" argument that a witness "impermissibly relied on hearsay in testifying that [the plaintiff] used foul language while working and that other managers found [the plaintiff's] performance record unsatisfactory" because "such testimony was proffered as evidence of [the employer's] rationale for its decision to terminate [the plaintiff], rather than for the truth of the matters asserted").

*Second*, although Wills suggests that the anonymous tip was "unsubstantiated," he provides no evidence—not even a citation—for that proposition. *See* Plaintiff's SOF ¶ 20. He's thus violated the "fundamental rule that each of [the party's] statements of fact must be pegged to record evidence via pinpoint citation[.]" *Shenzhen Kinwong Elec. Co. v. Kukreja*, 2021 WL 5834244, at *19 (S.D. Fla. Dec. 9, 2021) (Altman, J.) (cleaned up); *see also* S.D. FLA. L.R. 56.1(b)(1)(B) (noting that all facts must be "supported by specific, pinpoint references to particular parts of record material"). Even if Wills *had* pointed to record evidence for his position that the complaint was unsubstantiated, that evidence still wouldn't show that Walmart *discriminated* against him. While it may be a good business practice, in other words, to *substantiate* an employee's bad behavior before terminating him for it, we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Time and again, in fact, the Eleventh Circuit has reminded us that "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (cleaned up).

("Sears Depo.") at 11:6–12; *see also* Defendant's SOF ¶ 22; Plaintiff's SOF ¶ 22 (not disputing that this altercation with Sears occurred). Sears testified that, as they closed the store for the evening, she and Wills walked towards the back of the store "to check on the area." Sears Depo. at 17:16–18:2. While she conceded that the area "was a mess," Sears insisted that she "had it under control." *Id.* Nevertheless, Wills "started raising his voice." *Id.* "He seemed extremely angry." *Id.* Wills refused to allow Sears to "explain to him what was going on" and (instead) stormed away. *Id.* An assistant manager, Deborah Gormann, witnessed the incident and later urged Sears to write a statement reporting it—which Sears did. Defendant's SOF ¶ 22; Plaintiff's SOF ¶ 22 (not disputing this point).

In the following months, other *similar* reports came in. In mid-March, for example, Tammy Steele—the human resources manager—was touring Wills's store when an associate, Brenda Dauta, approached her and reported that she'd had two unpleasant run-ins with Wills. *See* Defendant's SOF ¶ 23; Plaintiff's SOF ¶ 23 (not disputing this point). During her deposition, Dauta explained that two "scenario[s]" with Wills had occurred recently. Deposition of Brenda Dauta [ECF No. 54-6] ("Dauta Depo.") at 13:8–19. In the first, Wills "yell[ed]" at Dauta while "throw[ing]" products on the floor. Dauta Global Ethics Complaint (Apr. 12, 2019) [ECF No. 61-1-1]. There was, she said, "nothing but total anger in his voice." *Id.* In the second, a few months later, "the same type of scenario happened." *Id.* "I have never been so humiliated," Dauta explained. *Id.* With Wills, it "had gone from awesome to good to just flip the lid. I mean, you never knew from second to second what his temperament was going to be." Dauta Depo. at 10:24–11:1. Dauta went on: "That was when I contacted Tammy [Steele] only because I saw her here in our store and I approached the young lady [Steele] and I asked her on her way out the building, 'What can I do?'" *Id.* at 13:8–19. Associate Harry Blizzard witnessed the first Dauta incident and wrote a statement—on the very same day Dauta approached Steele—that fully

corroborated Dauta's account. *See Blizzard Global Ethics Complaint* (Mar. 10, 2019) [ECF No. 61-1-2] (explaining that Wills grabbed boxes from a bin "and thr[e]w them down on the floor" while "raising his voice" at Dauta). Keep this Blizzard complaint in mind because it'll become important to our overall story.

Because of these complaints, Steele scheduled two "grassroots sessions" at Wills's store—one on March 28, 2019, and the second on April 4, 2019. Defendant's SOF ¶ 26; Plaintiff's SOF ¶ 26 (not disputing this point). Wills was on leave during these sessions. Defendant's SOF ¶ 40 (noting that Wills was on leave from March 27, 2019, to May 5, 2019); Plaintiff's SOF ¶ 40 ("Undisputed."). Grassroots sessions are designed to give associates the opportunity to talk openly about their concerns. Defendant's SOF ¶ 26; Plaintiff's SOF ¶ 26 (not disputing this point). Steele testified that *she* held the meeting because of the complaints associates had raised about Wills. In her words:

> Any time there is an uptake of Associate body concerns, a multitude of them then the market team makes it a precedent to get in front of all the associates as an open forum and separate it out by group by title and as an open forum with no management there, getting feedback so that they are comfortable in order to share, you know, some things that may not be going well in the building.

Steele Depo. at 68:19–69:2; *see also* Steele Decl. ¶ 8 ("In response to the complaints *I was receiving* from Associates and management, *I initiated* Grassroots meetings at Store 5911[.]" (emphases added)).[6]

---

[6]    Wills claims that Walmart "convened the meetings in March and April 2019 . . . to specifically target Plaintiff and confect a basis for his termination." Plaintiff's SOF ¶ 26 (citing Wills Depo. at 219:16–220:21). In support, Wills cites only his own deposition testimony, where he gave four reasons for feeling targeted: *First*, he "felt that [he] was retaliated against" because he "was on FMLA leave" when the meetings were called and because he "spoke up about the concerns of the work environment." Wills Depo. at 219:16–25. *Second*, he suspected foul play because "it's not standard practice to gather up documentation, to conduct a grassroots meeting regarding a particular individual." *Id. Third*, he testified that "there was -- there was documentation that managers, such as Deborah and Veneeray, were pulling the associates in the office to help them write statements to -- to proceed with the termination." *Id.* at 220:6–14. "And Tammy Steele also communicated with these

Wills says that Reinard "ran" the first grassroots meeting, *see* Plaintiff's SOF ¶ 27, but there's no evidence that Reinard played *any* role in the decision to call the meeting. To the contrary, all the evidence suggests that Reinard had nothing to do with setting it. *See, e.g.*, Steele Depo. at 49:15–23 ("Q: Do you know if Jimmy [Reinard] asked . . . to conduct this grassroots meeting? A: No, Jimmy did not ask . . . to conduct the grassroots meeting."); Reinard Depo. at 50:6–13 ("Q: While Marcellus was out on leave; did you have anything to do with setting up a grassroots meeting with Associates? A: Tammy [Steele] did that. Q: Did you ask her to? A: No, she asked me to partake."). More important, as Jacqueline Perez (Walmart's regional human resources director) testified, the decision to hold the

---

associates to ask for direct statements regarding -- only mean, nothing to do with the performance of other assistant store managers, the operation of the store or -- or anything." *Id. Fourth*, he said that, before the grassroots meetings, he had never been "brought into an office to -- to address any concerns that had arisen"—nor had he ever been given "support . . . from the market team to run my business." *Id.* at 220:1–5, 220:16–21.

For three reasons, we don't think a reasonable jury could find—on the basis of this testimony—that Walmart discriminated (or retaliated) against Wills *because of* (1) his decision to take leave, (2) his race, or (3) the complaints he filed. *First*, the *only* thing Wills uses to link the grassroots meeting with his "FMLA leave"—or, for that matter, to connect the meeting to his decision to complain about "the work environment"—is their temporal proximity (*i.e.*, that those things happened *before* the grassroots meeting). But this temporal proximity isn't helpful to Wills because (of course) *something else* happened just before the grassroots meeting—*viz.*, several female employees filed disconcerting ethics complaints about Wills's misconduct towards women. *Second*, the rest of Wills's "evidence" of discrimination (and retaliation) consists only of his own *allegations* that Walmart called the grassroots meetings to target him, that it collected statements about him, that it declined to talk to him about those statements, and that it failed to offer his team more support. But there's no evidence that any of these *business* decisions had anything to do with protected activity or race. And there's certainly no evidence for the simply implausible supposition that a team of previously-unconnected Walmart employees—including Steele (who, again, is black)—conspired to punish Wills for being black, for reporting discrimination, or for taking leave. *Third*, with these allegations out of the way, the only thing Wills has left is pure speculation that he was discriminated (and retaliated) against for unlawful reasons. But speculation isn't enough to survive summary judgment. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)).

meeting had nothing to do with Wills's race or his decision to take leave. Instead, Perez explained,

Steele called the meeting to address the concerns Wills's coworkers had expressed. In Perez's words:

> Again, like I stated earlier, whether Marcellus was on LOA or not had no -- had nothing to do with the fact that we went into the store and spoke to associates. The reason why we went into the store and spoke with associates is because they started to reach out to the market office because they felt that they were, since he was actually on leave of absence, they felt safer coming forward in regards to the behavior that was happening in the building.
>
> So it had nothing to do with that. It had everything to do with the fact that associates approached the market office about the behavior, and then that's when the market -- the market team engaged in the grassroots sessions to see what was happening in the store since we did hear from associates and how they felt initially.

Deposition of Jacqueline Perez [ECF No. 54-8] ("Perez Depo.") at 18:9–24. In fact, the evidence is

clear that the decision to conduct the grassroots session was entirely Steele's. Defendant's SOF ¶ 26;

Plaintiff's SOF ¶ 26 (not disputing this point). Again, like Wills, Steele is black. Defendant's SOF ¶ 5;

Plaintiff's SOF ¶ 5 (not disputing this point); *see also* Steele Depo. at 19:2–3 ("I am African-American

myself.").

The grassroots meeting uncovered additional problems with Wills's behavior. At the meeting,

a female associate at Wills's store—Martha Torres—told Steele that she found Wills threatening,

especially when he was angry. Steele Decl. ¶ 9. Torres ultimately refused to provide a written statement

because she was worried about retaliation. *Id.*[7] But this was just scratching the surface. Several other

---

[7] Wills's objection that Torres's "alleged testimony is inadmissible hearsay," Plaintiff's SOF ¶ 29, fails for two reasons. *First*, as we've said (*see supra* note 4), Walmart relies on its employees' complaints—not for the truth of the matter asserted—but to explain *why* it fired Wills (*i.e.*, as backdrop for its *belief* that Wills abused his coworkers). *Second*, the rule against using hearsay at summary judgment isn't absolute. "The general rule is that hearsay cannot be considered at the summary judgment stage[.]" *Smith v. LePage*, 834 F.3d 1285, 1296 n.6 (11th Cir. 2016). But there's an exception: "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*,

associates (and management employees) told Steele that Wills referred to the store as "his store" and that he warned associates not to report complaints to the market team—that is, to people outside "his store." *Id.* ¶ 10.[8] Steele also learned that, in March 2019 (just a month earlier), Wills had screamed at a female associate—in front of several customers—while throwing merchandise in anger. Defendant's SOF ¶ 27; Plaintiff's SOF ¶ 27 (not disputing this point). Specifically, Wills had scanned an item and determined that it was priced incorrectly. Deposition of Mary Jean Deppisch [ECF No. 54-9] ("Deppisch Depo.") at 8:1–16. Furious, Wills "started screaming" at Deppisch: "This is our money, our money[!]" *Id.* "He was cussing [at] me and it was just a very bad incident[.]" *Id.* at 8:24–25. After Wills berated her on the salesfloor, Deppisch decided to give up her department management position. Here's how she explained that decision:

> Q: So, you decided to step down yourself?
>
> A: Yeah. Yes, after that incident. Yes, I did. . . .
>
> Q: And why did you decide to step down?
>
> A: Because I do not need -- I want to say, he is a younger gentleman, screaming at me in the sales floor is very unprofessional, yelling and cussing at me. I don't need that. I just didn't -- I just couldn't the stress, it got to me. I just said, "I'm not going to do this anymore."

---

683 F.3d 1283, 1293–94 (11th Cir. 2012) (cleaned up). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Id.* at 1294. There are, to be sure, a couple of limitations on this reducibility exception. "We don't allow courts to consider hearsay evidence when there is only a *hypothetical* witness who might come forward to testify at trial." *Lewis v. Residential Mortg. Sols.*, 800 F. App'x 830, 834 (11th Cir. 2020). "We also don't allow courts to consider hearsay at the summary judgment stage when the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement." *Id.* (cleaned up). In our case, there appears to be nothing to stop Walmart from bringing Torres in to testify at trial. And neither of the two limitations are applicable here. As a result, even if Torres's statements *were* hearsay, we wouldn't be precluded from considering them.

[8] Wills (again) objects to this testimony as "inadmissible hearsay." Plaintiff's SOF ¶ 31. But, as we've explained (*supra* notes 4 & 7), Walmart doesn't offer these complaints for the truth of the matter asserted.

*Id.* at 9:24–10:9. As with Dauta, Deppisch's experience was fully corroborated. Two other employees—Trivis Wilson and Lisa Curran—witnessed Wills's blowup. Defendant's SOF ¶ 27; Plaintiff's SOF ¶ 27 (not disputing this point). The former (Wilson) later reported that a "customer" had "overheard" Wills screaming at Deppisch and "was highly upset" and "uncomfortable." Trivis Wilson Global Ethics Complaint (May 13, 2019) [ECF No. 61-1-4]. It's "total[ly] embarrassing," Wilson explained, for a customer to see a manager making a coworker "feel [like] less than a person." *Id.* The other employee who saw Wills's outburst (Curran) said she saw Wills "yelling" at Deppisch, shouting the word "fuck," and "throwing merchandise down in front of her on the sales floor." Lisa Curran Global Ethics Complaint (May 14, 2019) [ECF No. 61-1-5]. Curran reported that "I had three customers come over to me and [say] . . . this man was yelling at this older lady." *Id.* One of those customers "took down [Wills's] name" and told Curran that she "was going to call corporate." *Id.*

Sears, Dauta, and Deppisch filed written complaints against Wills. Wills contends that "[a]ll three witnesses who made written statements testified that they did not do so until after the grassroots meeting and that they would not have done so but for being told to give statements by Tammy Steele." Plaintiff's SOF ¶ 30. Here, Wills's account is mostly inaccurate. Sears, for instance, initially filed a written complaint in January 2019—well *before* the grassroots sessions—and then submitted an addendum in May 2019. *See* Sears Global Ethics Complaint (May 17, 2019) [ECF No. 61-1-7]; *see also* Sears Depo. at 23:11–15 (explaining that she "wrote a statement" in January or February 2019 and "gave it to our then personnel coordinator"). Sears wrote the addendum after Steele "called" her, "listened to what" she had to say about her incident with Wills, and "asked [her] to go ahead and make a statement about it." *Id.* at 12:1–22. Dauta similarly testified that she "called in" to Steele at human resources "[p]rior to the grassroots meeting" to report her concerns. Dauta Depo. at 12:22–13:2. Steele

18

"did not ask [her]" to write a statement; instead, Dauta contacted *her*. *Id*. at 12:9–21; *see also id*. at 16:25–17:2 ("Again, sir, under no circumstances did Tammy [Steele] or James [Reinard] ever ask me to write a statement. No they did not."). Deppisch had (like Sears and Dauta) complained *before* the grassroots meeting. *See* Deppisch Depo. at 11:12–23 (explaining that the incident occurred in March 2019 and that she reported it to an "HR person" on the floor "the day or so after"). But she only filed a *written* report after Steele suggested that she do so. *Id*. at 13:11–21. In either event, Wills *never* claims that Reinard—the only person who even hinted at racial bias—had *anything* to do with drafting, collecting, or prompting *any* of these (very serious) complaints against him.

After taking leave in late March 2019, Wills returned to work on May 6, 2019. *See* Defendant's SOF ¶ 41; Plaintiff's SOF ¶ 41 (not disputing this point). When he returned, Wills responded to the associate relations email—the one that came in right before he left—which had requested additional information about his complaint. *See* Email from Wills to Associate Relations (May 6, 2019) [ECF No. 54-1-16]. In his email, Wills wrote this:

> First the parties I'm speaking about in regards to retaliation are Market manager James reinard, Market HR Tammy Steele, Regional manager Jaime [Fernandez]. I have spoken to Jaime regarding this issue and he has not done anything about this. Also the only thing Jaime did was directed Market manager James to speak to me about the outline concern. Part of the central issue in the situation is the relationship and communication between me and James. He has threatening, signaling that I'm not a team player and when I request for information about the MIP and policy he said there is nothing they can do for me. Every time I have spoken up it feels my voice doesn't matter and I feel very disrespected and the way they are approaching me during these issues. This situation has not gotten better but worse.

*Id*.

Days later, Walmart's Global Ethics Department opened an investigation into Wills's complaint. *See* Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42 ("Undisputed."). The case was assigned to Molly Tomlinson, an associate relations case manager. Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42

("Undisputed."). On May 20, 2019—two weeks after Wills sent his follow-up email—Tomlinson wrote Wills to schedule a time to speak with him about his complaints. Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42 ("Undisputed."). Because Wills was on paid time off ("PTO") from May 17, 2019, through June 2, 2019, he didn't initially respond to Tomlinson's email. Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42 ("Undisputed."). When Wills returned from PTO, Tomlinson interviewed him about his complaint. Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42 ("Undisputed."); *see also* Molly Tomlinson's Notes from Ethics Interview (June 3, 2019) [ECF No. 54-1-23] (detailing Wills's conversation with Tomlinson about his complaint).

Armed with these two sets of complaints—from Wills on the one hand and his subordinates on the other—Reinard and Steele brought Wills in for a meeting on June 14, 2019. *See* Steele Depo. at 55:6–10 ("It was a follow up onto the grassroots meetings concerns and a follow up just to speak with him and find out what his pulses and what concerns or things that he wanted to talk about."). Wills says that he "emailed them prior to this meeting and [asked] for another HR representative to be present at the meeting and they denied this request. The reason they gave me was that I did not give them a reason that they consider reasonable." Interrogatories at 5. Wills avers that, at this meeting, he "told them, due to the circumstances of everything that transpired, 'I don't feel comfortable being in a room with you two privately.'" Wills Depo. at 163:4–10. "Tammy [Steele] agreed." *Id.* at 163:11. According to Wills, she said:

> "You have a good point. You know, we should have accommodated" – "we should have accommodated you for an independent HR because" -- she said that, you know, "That's something that, you know, going forward, we'll look into." But she said, "We need to stay focused on these matters at hand."

*Id.* at 163:11–17. On Wills's account, he "told Reinard and Steele that he had sent in multiple ethic concerns about them," but "[t]hey said this did not matter and they were still going to question him

regardless." Plaintiff's SOF ¶ 47. "So at that point, that's when James Reinard started to ask [Wills] about dates," Wills Depo. at 163:23–24, questioning him on "where he was on March 18th and 19th asking if he had gone to work those days," Plaintiff's SOF ¶ 47. Wills couldn't recall. *Id.* Wills then told Reinard and Steele that he felt like they were discriminating against him—and, as a result, he refused to answer any further questions:

> And, again, it felt very hostile, very like in a very authoritative tone at that point. And at -- at that moment, I -- I was telling them, I said, "I feel like I'm being harassed. I feel like you're" – "you guys are retaliating against me. Why do you guys think that it is good practice to have somebody in the room where there" – "there are ethics concerns that has been raised?" And they said, "That doesn't matter to us." Like, "we're not here about those ethics concerns. We're here about you."

> And -- and then I said, "Well, I don't feel comfortable, I feel like, you know, you guys are rash, and I feel like you" – "you guys are being discriminatory." And then she -- she -- Tammy asked, "Do you feel we discriminated against you?" And I said, "Yes." And she, at that point, said, "Well, again, we don't feel that way. You need to answer these questions." So at that moment, when they continued to proceed to ask me questions, I -- I kept responding to them. I said, "I would love to answer your questions and" – "and I would do so truthfully and" – "and honestly," I said, "but I would feel comfortable if I could have an HR third-party representative here so that" -- you know, whoever's taking in the information, they can be able to take in my side as well because, again, every time that she was writing, she was only writing from when James Reinard was asking something, and it felt like nothing was being recorded on my end.

Wills Depo. at 164:16–165:23. Wills pushed "for another meeting with another HR representative present," but Reinard and Steele "ended the meeting off by saying 'this is your meeting and we are done[.]'" Interrogatories at 5.

After all this, Wills filed a written complaint with Global Ethics summarizing the meeting. *See* Wills Global Ethics Complaint (June 19, 2019) [ECF No. 54-1-25]. Wills reported that he "did not feel comfortable speaking to these parties" because he had "spoken up to divisional and regional levels

about the negative work environment that has been developed and culture of this market." *Id.* He felt "like I'm being targeted by people I have spoken on." *Id.*

For her part, Steele sent a long report to Jacqueline Perez (the regional human resources director). *See* Email from Tammy Steele to Jacqueline Perez, Jaime Fernandez, and Lori Chumbler (June 14, 2019) [ECF No. 61-1-8]. Among other things, she explained that Wills was "uncomfortable with the market team" and that "he knows of forms of discrimination or retaliation that can come from these meetings." *Id.* She added that Wills "said he was aware that we were in his store to conduct grassroots meetings and that associates expressed to him that they were forced to provide statements to HR." *Id.* Wills refused to "cover the grassroots concerns presented by his associates," saying that he would only do so with an independent representative present. *Id.* Steele concluded:

> [W]e need your support to move quickly on this matter. Marcellus is of the frame of mind that he is not going to allow us to tour his store with him. The associates, customers and management deserve better from their Store Manager. Marcellus lacks respect for market, region and is not in-line with company direction labeling it as pressure driven and is proving his lack of fit in our organization.

*Id.* There's no evidence that Reinard had *anything* to do with drafting or sending this letter.

The HR and Global Ethics teams took things from there. Perez (regional human resources manager) partnered with her supervisor, Heather Haberer (district human resources manager) to decide what the next steps should look like. *See* Defendant's SOF ¶ 53; Plaintiff's SOF ¶ 53 ("Undisputed."). Haberer then contacted Global Ethics on July 20, 2020 (less than a week after Wills's meeting with Steele and Reinard) and asked Global Ethics to open a formal file for the ethics complaints that had been submitted against Wills. *See* Defendant's SOF ¶ 55; Plaintiff's SOF ¶ 55 ("Undisputed."). The Global Ethics Department, in turn, opened an ethics case and assigned it to

Global Ethics Director Lauren Schiller. *See* Defendant's SOF ¶ 55; Plaintiff's SOF ¶ 55 ("Undisputed.").

Once she got the case, Schiller started reviewing the associate statements Steele had gathered. *See* Deposition of Lauren Schiller [ECF No. 54-7] ("Schiller Depo.") at 54:15–18 ("Q: Mm hmm. And so you reviewed reports from whom to make that determination? A: They were associate interviews shared with me by the divisional HR, Heather Haberer, at the time."). Schiller determined, based on this review, that "there was a pattern of behavior with Marcellus where he was intimidating and berating, particularly three of the female associates in front of people on the floor, some of whom felt they were pressured to step down." *Id.* at 62:17–23. Based on these complaints (of Wills yelling at women), Schiller concluded that Wills had engaged in "gender discrimination." *Id.* at 86:24–87:1.[9] She also found troubling the allegation that "Marcellus would say if I get coached, you're going to get coached, to his associates in the store." *Id.* at 63:1–2; *see also id.* at 71:3–4 ("[H]e was found to have pressured associates into not reporting their concerns to anyone outside of the store or to ethics."). Schiller "was the person who provided the recommendation to terminate Marcellus based on the behaviors of -- brought forth by some of the associates in his store." *Id.* at 48:6–9. She was aware that

---

[9] Wills disputes that he engaged in gender discrimination, contending that "[a]ll three female employees who wrote statements unanimously testified that they did not believe they [were] discriminated against because of their gender." Plaintiff's SOF ¶ 56. Wills may very well be right. In her deposition for this case, Sears (for instance) testified that Wills had been "speaking negatively to *all* associates," and that included "all male and female employees." Sears Depo. at 16:19–25 (emphasis added). But whether Wills *in fact* discriminated against women is neither here nor there. The question, as the Eleventh Circuit has posed it, "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Here, Schiller could justifiably have believed—given the fully corroborated complaints of three different women—that Wills was targeting his *female* employees. Much more on this below.

23

Wills also had a pending complaint against his market team—but decided to terminate Wills before the investigation into *his* allegations had been completed. As she explained:

> So the determination was made to terminate Marcellus based on his pattern of harassing and intimidating behavior in his store. And that termination is very consistent with how we would treat other store managers who behaved the same way. And we would not delay that termination and leave those associates in the store at risk just because he had called in a retaliation allegation. We still investigated his concerns but we would not leave him in that position for that reason, if there was when there was evidence to recommend a termination based on his behavior.

*Id.* at 51:7–18. Schiller rested her decision entirely on the written statements Steele had gathered; that is to say, she didn't conduct her own separate investigation. *Id.* at 85:5–6 ("I'm not the investigator so I would not have personally questioned the associates.").

Wills suggests that Walmart's regional human resources director (Perez) was the ultimate decisionmaker and that Perez simply adopted Schiller's recommendation. *See* MSJ Response [ECF No. 58] (referring to Perez as "the ultimate decision-maker as to Plaintiff's termination"). Perez testified that Wills was terminated "because of an ethics investigation and because of the way that he was treating his associates, it was deemed gross misconduct, and the fact that he was discriminating against female associates." Perez Depo. at 14:7–13. Perez also "took the input and suggestions" from Reinard—who, "[b]ased off of the substantiation from ethics, . . . was in line with termination." *Id.* at 15:15–24. At a meeting on June 28, 2019, Perez told Wills that his employment had been terminated for gross misconduct. *See* Defendant's SOF ¶ 61; Plaintiff's SOF ¶ 61 (not disputing this point).

After firing Wills, Walmart "had an acting store manager" whose "name was Mason" and who was white. Sears Depo. at 19:15–19; *see also* Decl. of James Reinard [ECF No. 63-1] ("Reinard Decl.") ¶ 12 ("Upon Marcellus Wills' termination, an interim Store Manager was assigned to Store 5911 while interviews were conducted for the permanent Store Manager. The interim Store Manager was Mason

Rucker, who held that temporary role for 3 months."). Ultimately, though, Walmart replaced Wills with Damareous Young. *See* Defendant's SOF ¶ 67; Plaintiff's SOF ¶ 67 (not disputing this point). And, as of the filing of the summary-judgment briefs, Young—who's black—was still the manager of the store Wills had once led. *See* Defendant's SOF ¶ 67; Plaintiff's SOF ¶ 67 (not disputing this point).

After Wills's termination, Walmart completed its separate investigation into Wills's ethics complaints. *See* Defendant's SOF ¶ 62; Plaintiff's SOF ¶ 62 ("Undisputed."). As we've said, Molly Tomlinson was assigned to investigate Wills's grievances. *See* Defendant's SOF ¶ 42; Plaintiff's SOF ¶ 42 ("Undisputed."). In that role, Tomlinson spoke to Steele and Reinard on July 9, 2019 (a week or so after Wills had been fired). *See* Defendant's SOF ¶ 63; Plaintiff's SOF ¶ 63 (not disputing this point). Tomlinson also interviewed two black store managers whom Wills had identified as potential witnesses. *See* Defendant's SOF ¶ 64; Plaintiff's SOF ¶ 64 ("Undisputed."). When Walmart couldn't substantiate Wills's allegations, it closed his case. *See* Defendant's SOF ¶ 66; Plaintiff's SOF ¶ 66 (not disputing that Walmart couldn't substantiate the claims).

Wills filed this action on April 8, 2020. In his amended complaint, Wills asserts six claims against Walmart under the Family and Medical Leave Act (the "FMLA"), the Florida Civil Rights Act (the "FCRA"), and 42 U.S.C. § 1981. In order, these counts are: (1) interference under the FMLA (Count I); (2) retaliation under the FMLA (Count II); (3) race discrimination under § 1981 (Count III); (4) retaliation under § 1981 (Count IV); (5) race discrimination under the FCRA (Count V); and (6) retaliation under the FCRA (Count VI). *See* Second Am. Compl. [ECF No. 27] ¶¶ 30–88. To support his claims, Wills relies heavily on "the close temporal proximity between instances of Plaintiff engaging in protected conduct and events that led to his termination." MSJ Response at 16. He also points to "record evidence" that (in his view) "demonstrates that Plaintiff and other black store managers who

worked under Reinard were treated less favorably than similarly situated white store managers[.]" *Id.* at 9. Finally, he says that Walmart "specifically targeted managers who took FMLA leave." *Id.* 12.

In addition to the evidence we've already discussed, Wills cites the deposition testimony of the following four coworkers. *First*, Darnell Bernard—an assistant manager at Walmart—who testified that, although "[n]obody . . . ever came up to [him] about" testifying, he was feeling "anxiety" that he might be "fired in retaliation" for testifying in this case. Deposition of Darnell Bernard [ECF No. 57-2] at 8:20–9:3. Bernard said that, after one of the grassroots meetings, he "came to the assumption" that the purpose of the meeting was to get Wills fired, because "[t]hey were focusing on negatives, not positive." *Id.* at 11:4–6, 13:4–6. At the same time, he testified that he never "heard Jimmy [Reinard] making statements about Marcellus that [he] thought were off color"—nor had he "ever hear[d] Jimmy [Reinard] speaking to Marcellus in a negative way at all." *Id.* at 15:3–9.

*Second*, Wills relies on the testimony of Eric Garner, a store manager at a Walmart in Palm Springs, who testified that he took FMLA leave twice—for about six weeks each time. *See* Plaintiff's SOF ¶¶ 69–70. After Garner returned from leave the first time, Reinard and Steele had a meeting with him, where they asked him "why [he] was well enough to be shopping at another Wal-Mart while [he] was on the leave of absence yet [he] wasn't well enough to be in [his] own store." Deposition of Eric Garner [ECF No. 57-3] ("Garner Depo.") at 9:22–10:4. About three weeks after Garner returned from his second approved leave, he was fired for "job performance." *Id.* at 17:8–18:16. Jaime Fernandez (the regional general manager) fired him. *Id.* at 19:8–11. Garner claimed that Walmart would use grassroots meetings to "try to dig up dirt on you." *Id.* at 28:2–9.

Garner wasn't entirely clear on why (he thought) he was fired. As far as we can tell, he appeared to vacillate between three theories. The first was that Fernandez wanted him to be fired because he

had previously filed a complaint against Fernandez after Fernandez "told Jimmy [Reinard] to get rid of poor store managers, that they had to go." *Id.* at 13:13–15. In Garner's words: "I think Jaime [Fernandez] was using Jimmy [Reinard] to target me." *Id.* at 19:19. Garner's second theory was that he was fired because he had taken FMLA leave—citing, for this view, *both* Reinard's questioning (when Garner got back) and Wills's own post-leave termination. *Id.* at 20:7–17. His third theory was that "Jimmy [Reinard] is a racist" because "it doesn't look good the way that the African-American store managers and the white Caucasian manager that hung out with African-American store managers, all seem to be targeted." *Id.* at 33:23–34:3.

*Third*, Wills looks to the deposition testimony of Warren Wright, the Walmart store manager in Pompano Beach. *See* Wills Depo. at 55:11–25. After Walmart fired Wright, Reinard (as we've seen) pushed Wills to take this (better) role, but Wills declined. *Id.* Wright suspected that his race was in some way relevant to Reinard's decision to fire him:

> Q: Do you think James Reinard is a racist?
>
> A: I don't think he is a direct racist in that regard or with the intention, I think, which you are speaking. I do believe his tendencies and his actions were in regard to race because there was no other qualifiers that I personally could come up with own what happened to Marcellus, myself and a few others.

Deposition of Warren Wright [ECF No. 57-5] at 12:7–14 (errors in original).

While claiming that he "could not find any other reason for [Reinard] to terminate" him, Wright conceded that his "store was not up to standard[s]." *Id.* at 18:20–23. In fact, Wright acknowledged that he'd never heard Reinard "say anything . . . about race," *id.* at 20:10–13, and that Reinard never made "any demeaning comments to any other black managers," *id.* at 26:7–13. Instead, in Wright's telling, Reinard made comments "to all of us as a group. You know, it was just his way. He had a terrible way of leading and that was just he just -- it was just his way I guess." *Id.* At the same

time, Wright felt Reinard "held [him] to a different standard than white managers" in the market. *Id.* at 20:13–16.

Reinard fired Wright. *See* Plaintiff's SOF ¶ 79. At Wright's termination meeting, Reinard "basically outlined why he was terminating [him] based on poor standards, based on [his] inability to follow the processes." Wright Depo. at 23:2–7. Wright had previously been disciplined by a prior market manager (before Reinard joined) for failing to meet "facility or housekeeping standards." *Id.* at 46:21–47:18. After Reinard had taken over as market manager, Wright's store also failed two safety inspections—both conducted by a third-party vendor called Ecolab. *Id.* at 55:14–57:23 (describing the inspections). Despite all this, Wright appealed his termination to Fleming—the divisional operations director. *See* Plaintiff's SOF ¶ 79. Wright testified that he "highlighted" to Fleming "a clear path where Jimmy [Reinard] was directly targeting, he was discriminating against me versus the other managers who spent more time in my store versus the other managers." Wright Depo. at 21:15–22:20. Wright testified that, after this appeal, Walmart overturned his termination, rehired him, and moved him to a different role in a different market. *Id.* Wright was "not aware" what went into Walmart's decision. *Id.* at 43:10–19.

*Fourth*, Wills invokes Robin Sanders's deposition testimony. Sanders was the store manager who took over Wright's store after Wills declined the role. *See* Deposition of Robin Sanders [ECF No. 57-4] ("Sanders Depo.") at 8:6–14. Sanders testified that she couldn't think of anything that "points to [Reinard] treating anybody differently because of their race." *Id.* at 9:9–16. While she did point to one example where she was treated differently than Neil Manusa—a white store manager—she conceded that this disparate treatment was based on experience, not race:

> Q: Sure. I'm sorry about that. While you were working with Jimmy Reinard as your district manager or market manager, did you feel that he treated Neil [Manusa] different than you based upon race?
>
> A: I'm not going to say it's race, but I know he had more tenure than I did. And I was a new store manager, so I was still in what I would consider a training phase and still trying to figure out the ropes of being a store manager. So, one of the things that I know is that if your numbers were good, if your metrics were good, regardless of how you got those numbers or metrics, you were not bothered. So, his numbers were good. His metrics were good. He was off of the radar, you know?

*Id.* at 12:2–16. In fact, when asked if Reinard had shown any differential treatment, Sanders testified: "Well, one of the things I want to be clear about is I was promoted by Jimmy [Reinard], so I don't want to say that he had bias[.]" *Id.* at 12:23–25. The one reference to race Sanders remembered was that Reinard had "rhetorically stated why did we not invite other store manager[s], non-African-Americans to come along with us. Jimmy [Reinard] stated we needed to work to communicate and build relationships with other store managers non-African-Americans within the market team." *Id.* at 10:4–11.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla.*

*Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

**ANALYSIS**

### A.  The FMLA Claims

"[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act[.]" *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (cleaned up); *see also Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) ("The two types of claims available to employees under the FMLA are interference and retaliation claims."). Wills has advanced both types of claims—but no reasonable jury could find for him on either.

### 1.  The FMLA Interference Claim

The FMLA's interference provision makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). The benefits afforded by the FMLA include (1) the right to "12 workweeks of leave during any 12-month period" for certain family events, 29 U.S.C. § 2612(a)(1); and (2) the right to "be restored by the employer to the position of employment held by the employee when the leave commenced," 29 U.S.C. § 2614(a)(1); *see Spakes v. Broward Cnty. Sheriff's Off.*, 631 F.3d 1307, 1309 n.1 (11th Cir. 2011) ("The FMLA entitles eligible employees to twelve weeks of leave during any twelve-month period because of a serious health condition . . . as well as the right to be reinstated to the

position that they held when the leave began or to an equivalent position[.]"). In short, "[t]o prevail on a claim for FMLA interference, an employee must show that his employer denied him a benefit to which he was entitled under the FMLA." *Bartels v. S. Motors of Savannah, Inc.*, 681 F. App'x 834, 840 (11th Cir. 2017).

In our case, Walmart never denied Wills *any* benefit under the FMLA. Wills first asked for leave (because of his father's heart attack) from December 17, 2018, through January 3, 2019. *See* Joint Statement of Undisputed Material Facts [ECF No. 71] ("JSOF") ¶ 19. Walmart approved that request *in full. Id.* Wills then requested leave starting on March 27, 2019, for recurrent depression and for acute stress disorder. *Id.* ¶ 40. He later sought to extend this second leave request through May 5, 2019. *Id.* As we've seen, Walmart (again) approved both requests *in full. See id.*; *see also* Leave Approval Message (May 14, 2019) ("We are pleased to let you know that your request for . . . a leave of absence was approved."). Wills wasn't terminated until June 28, 2019—almost two months *after* he returned from leave the second time. *See* Defendant's SOF ¶ 61; Plaintiff's SOF ¶ 61 (not disputing this point). By then, of course—as we'll discuss in a moment—Walmart had learned a great deal about Wills's public cruelty towards some of the women who worked for him. On these facts, Wills got everything he was entitled to under the FMLA—which is to say, Walmart didn't "interfere with, restrain, or deny . . . any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

Unsurprisingly, the Eleventh Circuit has regularly held that an employee cannot state an interference claim when he was given all the leave he was due, when he was restored to his prior position, and when he was only fired *after* his return. *See, e.g., Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999) ("[A] plaintiff suffers no FMLA injury when she receives all the leave she requests[.]"); *Dixon v. Pub. Health Tr. of Dade Cnty.*, 567 F. App'x 822, 826 (11th Cir. 2014) (noting

that an interference claim is not viable "if [the plaintiff] was terminated after she received twelve weeks of leave" and affirming summary judgment because the plaintiff was fired "three days" after her leave expired); *Penaloza v. Target Corp.*, 549 F. App'x 844, 848 (11th Cir. 2013) (concluding that the plaintiff "cannot show that she was denied any benefit to which she was entitled under the FMLA" because "[s]he was terminated two weeks after her 12-week leave period ended").

And, on this point, several *other* circuits agree. *See, e.g., Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) ("Thus, an interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leave or while the employee is still on FMLA leave. In contrast, a retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work."); *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014) ("Because [the plaintiff] received all of the benefits to which he was entitled by taking leave and then being reinstated to the same position from which he left, . . . he fails to make a prima facie showing of interference[.]"); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) ("[The plaintiff's] FMLA leave request was approved in full by Greenwald, and [the plaintiff] returned to work on October 16, the date certified by Dr. Grainger, at which time he was reinstated by CBT to his former position as a network technician. He resumed his normal work routine until he was terminated on November 8, 2007. Consequently, CBT did not shortchange his leave time, deny reinstatement, or otherwise interfere with his substantive FMLA rights.").

Against all this, Wills offers two arguments—both unavailing.

*First*, Wills contends that the FMLA interference provision "encompasses a wide range of conduct," including "an employer's decision to terminate an employee after his leave request." MSJ

Sur-Reply [ECF No. 68] at 1 (quoting *Walker v. United Parcel Serv., Inc.*, 2021 WL 1089872, at *8 (S.D. Fla. Mar. 22, 2021) (Altman, J.)). While it's true that FMLA interference claims "encompass a wide range of conduct," their scope isn't infinite or (even) indefinite. "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012). In our case, that text is clear. Under the plain language of the FMLA, an employer violates the interference provision only if it "interfere[s] with, restrain[s], or den[ies]" a right under the FMLA. 29 U.S.C. § 2615(a)(1). An employer does this when it fires an employee *before* the employee takes leave or *during* the approved leave—thereby depriving the employee of the FMLA's benefits. But where, as here, the employer fully approves an employee's request for leave—and then restores the employee to his prior position—it hasn't *interfered* with anything.

*Second*, Wills gestures at the Eleventh Circuit decision in *Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018). In that case, the Eleventh Circuit, describing the elements of FMLA interference and retaliations claims, commented that "[a]t summary judgment . . . the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same." *Id.* at 1331. But the panel made *that* observation in a case where an employer had "eliminated" an employee's position *while* the employee was on FMLA leave. *Id.* at 1320 (noting that, "[w]hen [the plaintiff] returned from her leave, [her employer] informed her that her Audit Manager position had been eliminated"). As a result, the employer had unambiguously interfered with her FMLA right to be

reinstated upon her return. In such a case, of course, the interference and retaliation analyses do (for the most part) conjoin, and an interference claim remains quite viable. Not so here.[10]

*       *       *

Because Wills received all the benefits Walmart owed him under the FMLA, no reasonable jury could find that Walmart interfered with his FMLA rights.[11]

### 2.   The FMLA Retaliation Claim

That leaves us with Wills's FMLA retaliation claim. "[W]e analyze FMLA retaliation claims based on circumstantial evidence under the *McDonnell Douglas* framework[.]" *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021).[12] "*McDonnell Douglas* established a three-step process for analyzing [retaliation] claims." *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 F. App'x 452, 455 (11th Cir. 2011). *First*, "the plaintiff must . . . offer evidence sufficient to establish a *prima facie* case of discrimination and/or retaliation." *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 892 (11th Cir. 2018). *Second*, "[o]nce a prima facie case is made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* *Third*, "[i]f the employer

---

[10] Note, too, that the *Batson* Court said the interference and retaliation inquires were "essentially the same"—not that they are (in fact) identical. And, in any case, even if the *Batson* Court had suggested that an FMLA plaintiff could establish an interference claim whenever she is fired (even if she's only fired after she returns), we would be bound to follow the Eleventh Circuit's earlier—and contrary— ruling in *Graham*. *See Del Castillo v. Sec'y, Fla. Dep't of Health*, ___ F.4th ___, 2022 WL 503740, at *7 (11th Cir. Feb. 18, 2022) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision." (quoting *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998))).

[11] In any case, "an employee can be dismissed, preventing her from exercising her right to commence [or return from] FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). As we're about to explain—*q.v.*, our discussion of Wills's animus towards female subordinates—that's exactly what happened here, and no reasonable jury could find otherwise.

[12] The *McDonnell Douglas* framework takes its name from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination and/or retaliation." *Id.* We consider each step below.

### a. *Prima Facie* Case

To establish a *prima facia* case of retaliation, an FMLA plaintiff must show: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207. The parties dispute only the third element—*i.e.*, whether Wills has shown causation. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated." *Krutzig*, 602 F.3d at 1234 (cleaned up). "Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (cleaned up). Temporal proximity is "measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Id.*

To meet his causation burden, Wills points to two things. *First*, temporal proximity. *See* MSJ Response at 11–12. Wills was fired on June 28, 2019, *see* Defendant's SOF ¶ 61; Plaintiff's SOF ¶ 61 (not disputing this point)—nearly two months *after* he returned from his second round of leave, *see* JSOF ¶¶ 19, 40. *Second*, Garner's testimony that he, too, was terminated shortly after taking leave. *See* MSJ Response at 12. We have some doubts about each of these contentions.

As to proximity, it's not entirely clear that the two-month gap between leave and termination is "close" enough to establish a *prima facie* case. *See Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230

(11th Cir. 2011) (suggesting that, standing alone, a "two-month gap . . . is not 'very close'").[13] And we shouldn't forget that the events that ultimately resulted in Wills's termination had already occurred *before* he took leave a second time. *See* Steele Decl. ¶ 8 ("In response to the complaints I was receiving from Associates and management, I initiated Grassroots meetings[.]"); *see also, e.g., Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

And we won't accept Wills's invitation that we analogize to Garner's firing because Wills's termination—which followed an extensive ethics investigation into allegations that he had shouted at several coworkers (sometimes in front of awe-struck customers)—didn't resemble Garner's situation *at all*. Still, we'll give Wills the benefit of the doubt and assume that he's set out his *prima facie* case.

b. **Legitimate, Non-Discriminatory Reasons**

---

[13] Neither party addresses whether we should look to the six months that passed between Wills's return from taking leave the *first* time or the two months after he returned from leave the *second* time. While the Eleventh Circuit has held that "temporal proximity . . . should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs," *Jones*, 854 F.3d at 1272, it hasn't (so far as we can tell) told us how to analyze temporal proximity when an employee takes leave *twice*. And we could see this issue going either way. Imagine, on the one hand, an employee who took leave ten years ago, who takes leave again for a totally unrelated issue now, and who is fired a day after returning from his second leave of absence. In this scenario, the employee's first leave request seems rather disconnected from—and, frankly, irrelevant to—his termination. And so, we wouldn't expect courts to take that first set of absences into account in deciding whether the employee had made out a *prima facie* case on causation. Now, consider, on the other hand, a case like ours: where the employee takes leave once in December—Walmart's busiest time of the year—and suffers no consequences. A few months later, the employee takes leave a second time—during what's probably an easier time for the company—and is fired two months after *that*. In this (more analogous) situation, we *could* see a court, when assessing the causation element, taking stock of the employer's decision *not* to fire the employee during the busier absence. Still, without circuit precedent one way or the other, we'll analyze this question to Wills's benefit and measure proximity from his second return.

37

Walmart has proffered legitimate, non-discriminatory reasons for terminating Wills. At this stage, "the burden shift[s] to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Drago*, 453 F.3d at 1307. Here, the employer bears only a "burden of production." *Id.* (quoting *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). Walmart says that it fired Wills because (1) he had been "abusive" to his coworkers, (2) he "discriminat[ed]" against female associates, and (3) he "threaten[ed]" his associates as a way of preventing them from reporting their concerns to management. *See* Defendant's SOF ¶¶ 56–57; *cf.* Schiller Depo. at 51:7–9 ("So the determination was made to terminate Marcellus based on his pattern of harassing and intimidating behavior in his store.").

These are (we think it should go without saying) more than sufficient to meet Walmart's burden of production. *See, e.g.*, *Vahey v. Philips Elecs. N. Am. Corp.*, 461 F. App'x 873, 875 (11th Cir. 2012) (finding a legitimate, non-discriminatory reason based on "repeated complaints from [the plaintiff's] subordinates about [the plaintiff's] condescending and aggressive managerial style"); *Barthlow v. Jett*, 303 F. App'x 723, 724 (11th Cir. 2008) (finding it "clear that [the employer] had a legitimate reason for firing [the plaintiff]" because the plaintiff's "file contain[ed] numerous reprimands for abusive and harassing incidents with co-workers"); *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 523 (11th Cir. 2007) (finding a legitimate, non-discriminatory reason where the plaintiff—while trying to make a joke—was found to have "verbally abus[ed] her co-worker"); *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1372 (S.D. Fla. 2001) (Gold, J.) ("It is beyond question that an inability to get along with co-workers and demonstrated caustic or rude behavior is a legitimate, nondiscriminatory reason for an employment decision." (quoting *Garcia-Cabrera v. Cohen*, 81 F. Supp. 2d 1272, 1280–81 (M.D. Ala. 2000))).

38

### c. **Pretext**

No reasonable jury could find that Walmart's reasons for terminating Wills were pretextual. Once an employer identifies a legitimate, non-discriminatory reason for the termination, "the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Diaz v. Transatlantic Bank*, 367 F. App'x 93, 96–97 (11th Cir. 2010) (quoting *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). The employee "must address the employer's proffered legitimate reason[s] head on and rebut [them]." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 838 (11th Cir. 2015) (cleaned up). "One way a plaintiff can satisfy [his] burden is by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Matamoros*, 2 F.4th at 1337 (quoting *Alvarez*, 610 F.3d at 1265). None of Wills's pretext contentions create a genuine issue of material fact.

*First*, Wills appears to rely (again) on the "temporal proximity" between his FMLA leave and his termination. *See* MSJ Response at 11–12.[14] "Although [Wills's] temporal-proximity arguments may be enough to establish a prima facie case of retaliation, temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219–20 (11th Cir. 2021); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020) (en banc) (same). The FMLA won't shield an employee from termination when the "employer is motivated not by the taking of the leave itself, but rather by prior deficiencies that,

---

[14] We say "appears to" because Wills doesn't actually advance this argument in the pretext section of his brief. But he does make the argument elsewhere—for instance, as we've seen, in a section on his *prima facie* burden. And so, while we're not generally in the business of making arguments for the parties, we'll construe Wills's brief liberally and address this (and some other arguments) as if Wills had deployed them to establish pretext. As we'll see, even this doesn't save him.

whenever they were discovered, would have prompted demotion or discharge whether or not the employee took FMLA leave." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1242 (11th Cir. 2010).[15]

That's exactly what happened here. Wills was out on leave, for the first time, from December 17, 2018, through January 3, 2019, JSOF ¶ 19—during what Wills describes as "one of the busiest times of the year," MSJ Response at 2. Still, Walmart approved his leave request in full. JSOF ¶ 19. And there's no evidence that *anyone* at Walmart *ever* told Wills *not* to take leave, that *anyone* at Walmart *ever* criticized Wills for taking leave, or that *anyone* at Walmart *ever* so much as mentioned his leave to him (or, for that matter, to anyone else). *See generally* Plaintiff's SOF. Nor did Wills, upon his return, suffer *any* adverse employment action. *See generally id.* What did happen when he returned, of course, was that Walmart started receiving complaints about how Wills was treating his subordinates. In late January 2019, for instance, an associate anonymously called Walmart's global ethics hotline and reported that Wills was a bully. *See* Steele Decl. ¶ 3. Around that same time, Sears filed a written complaint after Wills "blew up" at her on the salesfloor. *See* Sears Depo. at 11:6–12; *see also* Defendant's SOF ¶ 22; Plaintiff's SOF ¶ 22 (not disputing this point). In mid-March 2019, Steele was touring Wills's store when another associate (Dauta) "approached [Steele] and . . . asked her on her way out the building, 'What can I do?'" Dauta Depo. at 13:8–19. Dauta, as we've seen, was talking about the two times Wills had "yell[ed]" at her while "throw[ing]" Walmart products on the floor. *See* Dauta Global Ethics Complaint (Apr. 12, 2019).

---

[15] The Eleventh Circuit has observed that, to conclude otherwise—to conclude, that is, that the FMLA affords protection to "deficient employees from adverse employment actions, such that those workers could actually attain job security by seeking leave under the FMLA"—is a "laughable result . . . not supported by policy, by common sense, or, most importantly, by the statute itself." *Schaaf*, 602 F.3d at 1242–43.

Within a few weeks of Dauta's complaint, Steele scheduled two grassroots meetings. *See* Steele Decl. ¶ 8 ("In response to the complaints I was receiving from Associates and management, I initiated Grassroots meetings[.]"). Although the meetings were held shortly after Wills took leave for a second time, there was simply nothing suspicious about the timing of these meetings—given the recent groundswell of detailed complaints about Wills.[16] And those meetings only confirmed what Sears, Dauta, and the anonymous caller had already reported. Martha Torres, for instance, told Steele that she found Wills threatening when he was angry—though she refused to provide a written statement because she was afraid that he would retaliate against her. *See Id.* ¶ 9. Several associates and management members also told Steele that Wills referred to the Store as "his store" and that he warned associates not to report any complaints to the external market team. *Id.* ¶ 10. Finally, Steele learned that, in March 2019 (one month earlier), Wills yelled at another associate—in front of several

---

[16] In fact, while the parties don't tell us when the grassroots meetings were *planned*, the evidence supports the proposition that human resources planned them *before* Wills submitted his leave application:

> Q: Do you recall while Marcellus was out on FMLA leave, there was a grassroots meeting held by James Re[i]nard and you attended that meeting?
>
> A: Yeah, but the meeting was already planned prior to anybody being on a vacation or whatever you said, FLMA [sic]. Yeah, but the meeting was already planned.
>
> Q (By Mr. Remer): How do you know?
>
> A: Because it was posted on our board. It had to do something with the survey that was done prior. I mean, that's not uncommon for any Walmart.
>
> Q: When did you first find out that there was going to be a grassroots meeting on March 28th, 2019?
>
> A: Maybe two weeks prior.

Dauta Depo. at 9:7–21 (cleaned up).

customers—while angrily throwing merchandise at the floor. *See* Defendant's SOF ¶ 27; Plaintiff's SOF ¶ 27 (not disputing this point). As that associate (Deppisch) later explained, Wills found an item priced incorrectly and "started screaming" at her: "This is our money," he shouted, "our money[!]" Deppisch Depo. at 8:1–16. "He was cussing [at] me and it was just a very bad incident[.]" *Id.* at 8:24–25. After Wills berated her, Deppisch decided to step down from her management position. Here's how she described that decision:

> Q: So, you decided to step down yourself?
>
> A: Yeah. Yes, after that incident. Yes, I did. . . .
>
> Q: And why did you decide to step down?
>
> A: Because I do not need -- I want to say, he is a younger gentleman, screaming at me in the sales floor is very unprofessional, yelling and cussing at me. I don't need that. I just didn't -- I just couldn't the stress, it got to me. I just said, "I'm not going to do this anymore."

*Id.* at 9:24–10:9. Two other employees—Wilson and Curran—witnessed Wills's blowup. *See* Defendant's SOF ¶ 27; Plaintiff's SOF ¶ 27 (not disputing this point). And both testified that several customers had overheard Wills yelling at Deppisch, an older lady. *See* Trivis Wilson Global Ethics Complaint (May 13, 2019) (explaining that a "customer" had "overheard" Wills screaming at Deppisch and that the customer "was highly upset" and "uncomfortable"); Lisa Curran Global Ethics Complaint (May 14, 2019) (stating that she "had three customers come over to [her] and [say] . . . this man was yelling at this older lady").

In light of all this—the complaints from (1) the anonymous caller, (2) Sears, (3) Dauta, (4) Deppisch, (5) Torres, and (6) the other observers—Reinard and Steele met with Wills on June 14, 2019 (weeks after he returned from leave). *See* Steele Depo. at 55:6–10 ("It was a follow up onto the grassroots meetings concerns and a follow up just to speak with him and find out what his pulses and

what concerns or things that he wanted to talk about."). That meeting didn't go well. Wills refused to answer his supervisors' questions and accused them of discrimination. *See* Wills Depo. at 164:16–165:23 ("Well, I don't feel comfortable, I feel like, you know, you guys are rash, and I feel like you" – "you guys are being discriminatory. . . ." So at that moment, when they continued to proceed to ask me questions, I -- I kept responding to them. I said, "I would love to answer your questions and" – "and I would do so truthfully and" – "and honestly," I said, "but I would feel comfortable if I could have an HR third-party representative" present).

Soon after that, the Global Ethics Department opened an ethics investigation into Wills's misconduct and assigned Global Ethics Director Lauren Schiller to lead it. *See* Defendant's SOF ¶ 55; Plaintiff's SOF ¶ 55 ("Undisputed."). Schiller, in turn, reviewed the complaints Steele had gathered, *see* Schiller Depo. at 54:15–18, and concluded that "there was a pattern of behavior with Marcellus where he was intimidating and berating, particularly three of the female associates in front of people on the floor, some of whom felt they were pressured to step down," *id.* at 62:17–23. She also found that he "pressured associates into not reporting their concerns to anyone outside of the store or to ethics." *Id.* at 71:3–4. On these findings, Schiller "provided the recommendation to terminate Marcellus based on the behaviors of -- brought forth by some of the associates in his store." *Id.* at 48:6–9.

All of which is to say that, even in a vacuum, the nearly-two-month gap between Wills's return from leave and his firing isn't probative of anything. *See, e.g.*, *Drago*, 453 F.3d at 1308 (holding that three months is insufficient); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that three-and-a-half months is insufficient). And, when placed in its proper context, Wills's proximity argument is hopelessly implausible. The evidence overwhelmingly shows that Wills was

terminated—not because he took leave—but because he berated women who worked beneath him (sometimes in front of customers) and because he threatened his coworkers to prevent them from complaining to his supervisors. Since these intervening causes are (obviously) grounds for termination, we don't think the proximity (such as it was) between Wills's return and his termination proves anything. *See, e.g.*, *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 832 (11th Cir. 2019) (affirming summary judgment and finding no pretext where, although the plaintiff "was terminated within a few weeks of returning from FMLA leave," she had recently "reported to work impaired"); *Brisk v. Shoreline Found., Inc.*, 654 F. App'x 415, 417 (11th Cir. 2016) ("[T]he district court correctly granted summary judgment because there was no causal connection between the protected conduct—[the plaintiff] taking FMLA leave—and the adverse event, termination, when the temporal proximity of four months was tenuous and there was an intervening cause of poor work performance.").

*Second*, to meet his pretext burden, Wills relies again on Garner's termination. *See* MSJ Response at 12. To recap, here's what happened to Garner: In 2018, Garner (like Wills) took leave twice—from July 2018 to September 2018, and then again from November 2018 to January 2019. *See* Garner Depo. at 8:18–9:16. When Garner returned from his first leave of absence, Reinard and Steele questioned him "as to why I was well enough to be shopping at another Wal-Mart[.]" *Id.* at 10:1–4. And Fernandez, the regional manager, fired Garner for "job performance" about three weeks after he returned from his second leave of absence. *Id.* at 19:5–15, 33:11–12. While Garner offered several theories for his termination—including that "Jaime [Fernandez] was using Jimmy [Reinard] to target" him after Garner reported Fernandez for telling Reinard to "get rid of poor store managers"—one theory was that Walmart fired him because he took FMLA leave. *Id.* at 13:10–14, 19:5–22.

For a few reasons, we don't think this comparison to Garner creates a genuine issue of material fact. As an initial matter, Garner's evidence of retaliation was pretty weak. Even he conceded that his post-leave conversation with Reinard was the "only time" anyone mentioned his leave to him and that, after he returned, "everything was fine for a while." *Id.* at 14:2–9, 15:5–12. We very much doubt that this single comment—even combined with the three-week link between Garner's return and his firing—is enough to establish a plausible inference of retaliation. And Garner's scattered speculation about Walmart's "true" reasons for firing him —which ranged from FMLA retaliation to racial discrimination to frustration with his decision to report Fernandez for wanting to fire ineffective managers—don't get us there either. *See, e.g., Cordoba*, 419 F.3d at 1181 ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)).

But—as we've suggested—the comparison to Garner is flawed in a more fundamental way. Wills, after all, was terminated only after several employees independently reported that he had demeaned them on the salesfloor—often in front of others, sometimes in front of customers. *See, e.g.,* Dauta Global Ethics Complaint (Apr. 12, 2019); Sears Global Ethics Complaint (May 17, 2019); Deppisch Global Ethics Complaint (May 10, 2019) [ECF No. 61-1-6]. And Walmart fired Wills only after its Global Ethics Department ran a full-fledged ethics investigation, during which it found that the coworkers' complaints were substantiated. *See generally* Schiller Depo. None of this happened with Garner. Garner's grievances—whatever their merits—just don't help Wills here.

One more thing on Garner. In Garner, Wills has found a *single* incident involving *one* Walmart employee who claims (albeit obliquely) that Walmart engaged in FMLA retaliation against him. But

Reinard alone oversaw nine Walmart stores. *See* Reinard Decl. ¶ 2. And there are, as Garner himself

explained, "like 200 to 400 to maybe 600 employees in a Wal-Mart store depending on its size." Garner

Depo. at 29:4–6. If Garner's right—and we have no reason to doubt him—then Reinard supervised

between 1,800 and 5,400 employees *at any given time*. To cherry pick from this veritable army of Reinard

subalterns *one* employee who may (or may not have been) terminated in quasi-close proximity to his

leave tells us almost nothing about Reinard's propensity (as it were) for unlawful decision-making.

And, even if it did, it still would tell us nothing about the people who *actually* laid the groundwork for

Wills's firing—people like Steele, Schiller, and Perez, all of whom indisputably had *nothing* to do with

Garner's termination. As the Eleventh Circuit held in a similar context:

> Caldwell points to evidence that two other teachers at Marshall Elementary claimed
> that [the principal] had retaliated against them for taking FMLA leave around the same
> time. However, while this evidence may be probative of [the principal's] discriminatory
> intent generally, it does not show that [the principal] retaliated *against Caldwell* for
> taking FMLA leave. And, without more, on this record, the evidence would not permit
> a reasonable jury to find that the School District's reasons for Caldwell's non-renewal
> were not the real reasons for the adverse employment decision.

*Caldwell v. Clayton Cnty. Sch. Dist.*, 604 F. App'x 855, 863 (11th Cir. 2015) (cleaned up). That same logic

applies with equal force here.

*Third*, Wills questions the wisdom of Walmart's decision to terminate him. Here, he points to

Sears's testimony that, "[a]side from constantly being out of his normal character for the entire day"

on which he yelled at her, she "always looked up to Marcellus for the way that he speaks to people."

Sears Depo. at 16:8–18. He also cites Deppisch's testimony that "Marcellus and I had a very good

working relationship. In the five years we were together, we had one really bad day." Deppisch Depo.

at 16:19–22. But the FMLA doesn't shield employees who have lots of good days and only a few bad

days. Indeed, it only takes "one really bad day" to hurt someone, to destroy the workplace, or to lose

loyal customers. Here's the point: Even if Wills were right that Walmart's decision to fire him was draconian or ill-advised—and, given the severity of the complaints against him, we doubt that it was— "the reasonableness of [Walmart's] disciplinary policies are not a consideration." *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000).

*Fourth*, Wills tries to link the complaints Sears, Dauta, and Deppisch filed to some (supposed) retaliatory intent on the part of Reinard. In this attempt, he falters at every turn. So, for instance, to show retaliatory intent, Wills relies on Garner's testimony that Reinard and Steele held grassroots meetings at Garner and Wills's stores while the two were on leave and that Reinard "was just trying to push buttons and dig up dirt, along with HR by his side." Garner Depo. at 28:10–15. Even assuming that Reinard and Steele *were* scheduling the grassroots meetings to dig up dirt on their subalterns, we'd still be left with pure conjecture for Wills's view that they did those things *because* those subalterns had taken leave.[17] And conjecture, as we've said, isn't enough to survive summary judgment. Next, to tether that (imagined) intent to his coworkers' complaints, Wills contends—without any citation to the record—that "[a]ll three witnesses who made written statements testified that they did not do so until after the grassroots meeting and that they would not have done so but for being told to give statements by Tammy Steele." MSJ Response at 14. Here, the missing citation is a dead giveaway: Wills's allegation is simply false. Both Sears and Dauta testified that their complaints had nothing to do with Steele or the grassroots meetings. *See* Sears Depo. at 23:11–15 (explaining that she independently "wrote a statement" months *before* the meeting and that she "gave it to our then personnel coordinator"); Dauta Depo. at 16:25–17:2 ("Again, sir, under no circumstances did Tammy

---

[17] As we explain below, there's simply no evidence of Reinard's involvement in scheduling these meetings.

or James ever ask me to write a statement. No they did not.").[18] Note, in this respect, that Blizzard—who witnessed Wills's verbal assault on Dauta—filed his written report, in which he fully corroborated Dauta's account, on March 10, 2019 (more than two weeks *before* the first grassroots meeting). *See* Blizzard Global Ethics Complaint (Mar. 10, 2019) (explaining that Wills grabbed boxes from a bin "and thr[e]w them down on the floor" while "raising his voice" at Dauta). In other words, Wills has offered no evidence that Reinard or Steele acted with retaliatory intent, and—even if he had—the evidence unambiguously shows that the complaints had everything to do with Wills's misconduct and nothing to do with either Reinard or Steele.

*Fifth*, Wills tries to undermine Walmart's explanation for his termination by arguing that the "three female employees who wrote statements unanimously testified that they did not believe they [were] discriminated against because of their gender." MSJ Response at 15; *see also, e.g.*, Sears Depo. at 16:19–22 (agreeing that "he was speaking negatively to all associates"); Deppisch Depo. at 18:22–24 (testifying that she did not think that "Marcellus yelled at [her] and cussed at [her] because [she's] a woman"). The problem with *this* argument (as we've said) is that it doesn't matter—for our purposes—whether Wills *in fact* discriminated against women. "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a *discriminatory* reason." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1329 (11th Cir. 2020) (cleaned up). What matters is that Walmart concluded—based on four independent complaints from female associates—that Wills *was* targeting women. There's no evidence that Walmart *knew* Wills was

---

[18] Nor has Wills asked us to impute Reinard's (or Steele's) intent to the higher-ups who *actually* fired him. Put another way, even if a "cat's paw theory" *were* (theoretically) applicable in this context, we don't think Wills has adduced enough (or, really, any) evidence to apply that theory here. Much (much) more on this below.

*also* cruel to men, and so there's no reason to think that Walmart's conclusion—"even if mistaken[] or unfair[]"—was pretextual. *Alvarez*, 610 F.3d at 1266; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

There are, of course, other problems with Wills's argument that he isn't guilty of gender discrimination. For one thing, it's not clear how Wills's mistreatment of *all* associates (rather than just the female ones) helps him. For another, Wills's argument only addresses *one* of the *three* reasons Walmart proffered for firing him (*i.e.*, that he was targeting women). So, even if Wills *had* rebutted *that* reason—and he hasn't—he'd still have given us nothing to rebut the other two. *See Chandler v. Ga. Dep't of Behav. Health & Developmental Disabilities*, 861 F. App'x 296, 300 (11th Cir. 2021) ("When an employer articulates more than one legitimate, non-retaliatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." (cleaned up)).

\*   \*   \*

Walmart, in short, has proffered legitimate reasons for firing Wills. And those reasons are quite compelling: Wills went on several tirades, yelling at employees and throwing objects, sometimes in front of customers. The complainants were all female—some of them older—who worked underneath Wills in the Walmart hierarchy. And several *other* employees revealed that Wills had threatened them not to report him to management. None of Wills's facts—either individually or together—show any evidence of pretext. No reasonable jury, in other words, could find that Walmart retaliated against Wills for taking FMLA leave.

**B. The Race Claims**

Wills says that Walmart (1) discriminated against him on the basis of race, in violation of §

1981 and the FCRA, and (2) retaliated against him for reporting this race-based discrimination—again,

in violation of § 1981 and the FCRA. *See* Second Am. Compl. ¶¶ 47–88. We'll take the discrimination

and retaliation claims in turn.

### 1.  The Race Discrimination Claims

The Eleventh Circuit has held that "[c]laims of discrimination under § 1981 and the FCRA are

analyzed in the same manner as those brought under Title VII." *Austin v. Progressive RSC, Inc.*, 265 F.

App'x 836, 844 (11th Cir. 2008). Both statutes "prohibit[] employment discrimination based on race."

*Mosley v. MeriStar Mgmt. Co., LLC*, 137 F. App'x 248, 251 (11th Cir. 2005). "[A] plaintiff may prove

race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683

F.3d 1249, 1257 (11th Cir. 2012). Wills's claim fails under either method.

### a.  Direct Evidence

"Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent

without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "To

be direct evidence, the remark must indicate that the employment decision in question was motivated

by race." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002). The Eleventh

Circuit has explained that "'only the most blatant remarks, whose intent could be nothing other than

to discriminate on the protected classification' are direct evidence of discrimination." *Id.* at 1227

(cleaned up) (quoting *Damon*, 196 F.3d at 1359); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th

Cir. 1999) (same).

Since direct evidence of discrimination "establishes the existence of discriminatory intent

behind the employment decision without any inference or presumption," any "remarks by non-

decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of

discrimination." *Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Direct evidence would include, for instance, "a frank admission from a manager that he refused to hire an applicant because he was black." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)).

Wills hasn't satisfied this stringent standard here. At its core, Wills's entire race-discrimination claim rests on five comments Reinard made to him over the course of their working relationship. *See* MSJ Response at 6–7. *First*, in September 2018, Reinard took Wills out to lunch to offer him *a promotion. See* Wills Depo. at 55:21–24. At that lunch, Reinard "made the comment that as a black man, [Wills] needed to conform and [he] needed to prove [him]self to him and [regional manager] Jaime [Fernandez]." *Id.* at 54:21–55:10. Reinard also told Wills that Reinard's "former black associates . . . did not like him [Reinard]," but that he didn't care about "those people." Interrogatories at 4. *Second*, the day after this lunch, Wills turned down the promotion. *Id.* at 59:3–8 (testifying that he was "offered the promotion" but "kindly declined"). According to Wills, Reinard "began shouting that, you know you know, '[p]eople like you won't get an opportunity like this and, you know, you're' -- 'you are going to' -- 'you know, you are going to regret, you know, not taking this opportunity.'" *Id.* at 56:12–17. *Third*, after Wills and Reinard had an argument in November 2018, Wills told Reinard "I'm going to tell [your supervisor] about this." *Id.* at 150:3–152:13. In response, Reinard warned Wills: "Well, I mean, look at what happened to Warren [Wright]." *Id. Fourth*, Reinard observed, in February 2019, that he'd seen some of the black managers "walking together like a clique[.]" Wills Depo. at 155:10–16. *Fifth*, Sanders testified that, in March or April 2019, Reinard asked her and others why they had not "invite[d] non-African-Americans to come along with them" and said that black managers

"needed to work to communicate and build relationships with other store managers non-African-Americans within the market team." Sanders Depo. at 9:20–10:11.

While these comments "may be inappropriate and condescending," they "clearly fall[] short of the type of evidence that this Circuit has recognized as direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (cleaned up). Why? Well, for one thing, Wills has done nothing to show that any of these remarks were "made in the context of [his] termination." *Addison v. Ingles Markets, Inc.*, 515 F. App'x 840, 842 (11th Cir. 2013). In fact, Reinard made the first two comments in the course of offering Wills a *promotion*. And all of Reinard's comments came months—indeed, as many as nine months—*before* Walmart fired Wills at the end of June 2019. *See* Defendant's SOF ¶ 61 (showing that Wills was terminated in June 2019); Plaintiff's SOF ¶ 61 (not disputing the date). There's also no evidence that Reinard (or anyone else) made racist comments—either to Wills or to others—*during* the ethics investigation *or* the termination meeting. Because Wills hasn't identified any "statements made during the decision-making process, the statements are not direct evidence of age discrimination." *Jones v. BE&K Eng'g Co.*, 146 F. App'x 356, 359 (11th Cir. 2005); *see also Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination.").

But here's the thing: Even if Wills had linked the complained-of statements to the decision-making process, none of those statements resemble the sort of "blatant remarks, whose intent could be nothing other than to discriminate." *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter*, 870 F.2d at 582). Reinard told Wills he needed to "conform" as a black man, used the phrase "people like you," and told *other* black store managers to "build relationships" with white store managers. None of these

comments has anything to do with Wills's termination. And telling Wills he'd have to "conform" if he were interested in entering the "circle of trust" was, even viewed in the light most favorable to Wills, nothing more than a crude (and perhaps offensive) way of *helping* Wills into a kind of old-boys club. The only vague allusion to firing Wills came when Wills threatened to tell Reinard's superiors about their disagreement—a threat Reinard parried with his own admonition: "[L]ook what happened to Warren [Wright]." But even this comment was made *seven months* before Wills was terminated. And (in any event) the comment included *nothing* about race. There is, in sum, no smoking gun—no "Fire Wills—he's black"—that could constitute direct evidence of race discrimination. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'").

Courts in this Circuit routinely refuse to "give great weight . . . to language that is, at best, only circumstantial evidence" because, to do otherwise, would be to "blur[] the important distinction between circumstantial evidence and direct evidence for prima facie cases." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). Indeed, faced with far more damning evidence, the Eleventh Circuit has repeatedly cast aside claims of direct discrimination. *See, e.g., Scott*, 295 F.3d at 1227–28 (no direct evidence of discrimination, even where supervisor said "[w]e'll burn [the plaintiff's] black ass," because that statement was "too remote" and did "not directly relate[] to the subject of [the plaintiff's] termination"); *Morgan*, 750 F. App'x at 788 (no direct evidence of discrimination, even where the named partner of the plaintiff's firm said he did not like "Black people" and "that's why they're in the back of the office," because "these remarks and others like them were unrelated to the decisionmaking process"); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 888 (11th Cir. 2013) (no direct evidence of discrimination, even where the decisionmaker told

the plaintiff she "should go back to the night shift" to "be with her own kind," because "the 'your own kind' statement does not prove race or gender discrimination without inference"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (no direct evidence of discrimination, even where the decisionmaker admitted that she had "a bias against blacks" and that "she found that they were difficult for her to trust or get along with," because those statements "could have been expressing a desire to get past such prejudices" and "the statement does not relate directly to the [challenged employment] decision").

Because none of Reinard's statements establish—without inference or presumption—that Wills was terminated for a discriminatory purpose, they cannot serve as direct evidence of discrimination.

### b. Circumstantial Evidence

"A plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, the employee can "satisfy[] the burden-shifting framework set out in *McDonnell Douglas*." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). *Second*, the employee can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). In a jumbled section of his brief, Wills appears to invoke and apply both standards simultaneously. But, even construed charitably, Wills's claim fails under either framework.

### i. *McDonnell Douglas*

Wills's *McDonnell Douglas* claim stumbles right out of the gate. As we've said, under the *McDonnell Douglas* burden-shifting paradigm, the employee (at the first step) "bears the initial burden of establishing a prima *facie case* of discrimination by showing (1) that she belongs to a protected class,

(2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Id.* at 1220–21.[19] The parties dispute only the fourth prong of this first step: whether Wills has identified a similarly-situated comparator. "To meet the fourth prong, a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis*, 918 F.3d at 1228). A similarly-situated comparator "will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the

---

[19]     Wills quotes this same standard. *See* MSJ Response at 8 ("To establish a prima facie case of discrimination based on circumstantial evidence, Plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class."). Admittedly, the Eleventh Circuit has stated the test somewhat differently in other cases. Sometimes it says that an employee can make out a *prima facie* case by showing: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) *he was replaced by a person outside his protected class* or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (emphasis added). The italicized portion of that text is missing from the Eleventh Circuit's *en banc* ruling in *Lewis* and from many of the court's other enunciations of the governing test. *See Hanford v. Geo Grp., Inc.*, 345 F. App'x 399, 405 n.7 (11th Cir. 2009) (recognizing that the Eleventh Circuit has stated the *McDonnell Douglas* test both with and without the "replacement" prong).

      But, for two reasons, Wills's claim fails *even if* we assume that a plaintiff can make out a *prima facie* case *simply* by showing that he was replaced by a person *outside* his protected class. *First*, Wills never makes this argument, *see* MSJ Response at 8–10, so he's forfeited the position, *see Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." (cleaned up)). *Second*, even if Wills had advanced this argument, the undisputed evidence shows that, although Mason Rucker (a white employee) served as interim store manager for three months, *see* Reinard Decl ¶ 12, Walmart *permanently* replaced Wills with Damareous Young (who's black), *see* Defendant's SOF ¶ 67; Plaintiff's SOF ¶ 67 (not disputing this point). Wills wasn't, in short, *actually* replaced by someone outside his protected class.

jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Id.* These considerations "leave[] employers the necessary breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1228.

Wills hasn't identified a *single* similarly-situated comparator. *See* MSJ Response at 8–10. He doesn't, for example, offer up a white store manager—or, for that matter, *any other employee*—who yelled at several coworkers (sometimes in front of customers) while throwing merchandise and who, despite this misconduct, *wasn't* fired. In fact, the record supports the exact opposite conclusion. As Schiller, the ethics case manager, testified: "[T]he determination was made to terminate Marcellus based on his pattern of harassing and intimidating behavior in his store. And that termination is *very consistent* with how we would treat other store managers who behaved the same way." Schiller Depo. at 51:7–11 (emphasis added). Despite having over nine months to develop the factual record in this case, Wills hasn't adduced a single piece of evidence to rebut this proposition. And that's sufficient to dispose of Wills's *McDonnell Douglas* claim here. *See, e.g.*, *Holmes v. City of Ft. Pierce*, 2022 WL 247976, at *6 (11th Cir. Jan. 27, 2022) (finding that the plaintiff failed to make a *prima facie* case because the "alleged comparators did not engage in the same basic misconduct").

Trying to parry, Wills offers two bits of testimony that (he says) suggest Reinard treated white employees better than black ones. *First*, he points to Warren Wright's testimony that Reinard was friendlier to (and less critical of) white store managers—like Neil Manusa, Philip Beoff, Michael Gillespie, and Mary[20]—than he was to Wills and Wright (who are black). *See, e.g.*, Wright Depo. at 26:17–21, 42:1–15 ("Again, I mentioned Neil [Manusa], and I mentioned Mary also and there's two other store managers who were also white, again, we were going to their stores, they were not given

---

[20] The parties don't identify Mary's last name.

the same level of, you know, stress that I was getting."). But Wright specifically admitted that he and Wills *weren't* similarly-situated to those four white managers:

> The[ir] stores are much bigger. Mine was only 93,000 square feet. It was a very small super center in terms of Walmart Super Centers. And I was expected to keep distances, p[a]llets between aisles and maintain the same standard as a store that was, you know, twice as big as mine, someone [sic] around three times. And it just was not possible getting that amount of freight in such a small box.

*Id.* at 26:17–27:4. Wills's store was the same size as Wright's. *See* Wills Depo. at 150:18–21 ("I was only a 93,000-square-foot store compared to our -- averages are about a 130- to 200,000 square feet."). In other words, on Wright's own telling, there were salient differences *other than race* that could explain the disparate treatment. In any event, Wills has offered no evidence—nor has he even suggested— that any of those white store managers ever berated, threatened, or humiliated their female employees (as he did). Wright's testimony thus doesn't help Wills here. *Skelton v. Birmingham Airport Auth.*, 2021 WL 4476800, at *3 (11th Cir. Sept. 30, 2021) (finding no *prima facie* case where, as here, none of the "comparators were alleged to have committed the same or substantially the same misconduct as" the plaintiff).

*Second*, Wills relies on Robin Sanders's testimony—which, if anything, seriously undercuts his position. Sanders (who's black) testified that she was treated differently than Neil Manusa (who's white). *See* Sanders Depo. at 10:12–11:21 ("I would say that I feel like there were some gaps in how I was treated[.]"). But Sanders didn't attribute this differential treatment to race:

> Q: Sure. I'm sorry about that. While you were working with Jimmy Reinard as your district manager or market manager, did you feel that he treated Neil [Manusa] different than you based upon race?
>
> A: I'm not going to say it's race, but I know he had more tenure than I did. And I was a new store manager, so I was still in what I would consider a training phase and still trying to figure out the ropes of being a store manager. So, one of the things that I know is that if your numbers were good, if your metrics were good, regardless of how

you got those numbers or metrics, you were not bothered. So, his numbers were good. His metrics were good. He was off of the radar, you know?

Q: Okay. You think that Jimmy [Reinard] had any type of bias based upon race?

A: When you say bias, what do you mean?

Q: Do you think that he was treating anyone different or doing anything differently to Neil [Manusa] or you because of your race or skin color?

A: Well, one of the things I want to be clear about is I was promoted by Jimmy [Reinard], so I don't want to say that he had bias, but I do believe that there were certain behaviors or things that were allowed for some and weren't allowed for others[.]

*Id.* at 12:2–13:5. Sanders herself, then, disclaimed any suggestion that Reinard treated white managers differently—at least not for reasons having to do with race. And, again, there's no evidence that Neil Manusa—or anyone else—abused and berated his female subordinates (as Wills had done).[21]

---

[21] Wills never suggests that Reinard—who once asked Wills if he was "stupid" and insinuated that Wills could be fired if he reported Reinard—is himself a valid comparator. *See* MSJ Response at 8–10. That's probably because Wills's whole theory in this case is—not that Walmart's ultimate decisionmakers discriminated against him—but that Reinard's racism infected the decision-making process. It's not our role to advance arguments a party—for whatever strategic reason—decided not to raise. And it's probably fair to say that, as with so many others, Wills has forfeited this argument. We add here only that, for three obvious reasons, the argument would've failed *even if* Wills had made it. *First*, Reinard "was not an adequate comparator because he held a different position with different responsibilities." *Robinson v. Walmart Stores E., LP*, 2021 WL 5881756, at *2 (11th Cir. Dec. 13, 2021). *Second*, Reinard's conduct wasn't the same as Wills's: There's no evidence, for instance, that he screamed at his female employees, that he threw merchandise in anger, or that he did any of these things in front of horrified customers. *Jones v. Unity Behav. Health, LLC*, 2021 WL 5495578, at *6 (11th Cir. Nov. 23, 2021) (finding no *prima facie* case because "the evidence fails to show [the comparator] engaged in the same basic conduct"). *Third*, there's no evidence that Walmart *knew* about Wills's discussion with Reinard (in which Reinard threatened Wills and called him stupid). *See Hester v. Univ. of Ala. Birmingham Hosp.*, 798 F. App'x 453, 457 (11th Cir. 2020) (finding no *prima facie* case where the decisionmakers "were all unaware of [the comparator's] alleged misconduct").

Because no reasonable jury could find that Wills was treated worse than a similarly-situated comparator, he's failed to meet his burden under *McDonnell Douglas*.[22]

### ii.    Convincing Mosaic

"As an alternative to the *McDonnell Douglas* burden-shifting test, a plaintiff can survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (cleaned up). A *convincing mosaic* "may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cleaned up). None of these factors support Wills.

*First*, Wills has presented no evidence of "suspicious timing." Nor has he claimed that this factor might support his convincing-mosaic theory. And for good reason. Although Wills has built his case around Reinard's (alleged) animus towards him, his employment timeline undermines his story. So, for starters, Reinard took over the market manager position in June 2018—or *more than a year* before Wills was terminated. *See* Defendant's SOF ¶ 2 (Reinard's start date); Plaintiff's SOF ¶¶ 1–2 ("Undisputed."); Defendant's SOF ¶ 61 (Wills's termination date); Plaintiff's SOF ¶ 61

---

[22] Even if he had made out a *prima facie* case, his claim would still fail. Walmart, as we've said, has offered several legitimate, non-discriminatory reasons for firing him, and Wills has failed to show that those reasons were pretextual.

("Undisputed."). About three months in, Reinard took Wills to lunch and offered him *a promotion* to a better store. *See* Reinard Depo. at 18:3–8 ("[I]t would be a promotion, it would be more money. A bigger bonus structure. It would be a good opportunity for him to take on a more . . . challenging store."). Especially when coupled with Reinard's decision to promote Sanders (who's also black), we hardly get a picture of a guy who's looking to harm black employees. In any event, Wills later described the lunch with Reinard (at which Reinard offered him the promotion) this way:

> So while we were eating, he, you know, first started to bring up that, "Hey Marcellus, you know, I don't know you. You know, I have heard good things about you. Your associates respect you highly. And" -- "and as" -- "you know, as a person in this company, you know, you've got to look at other opportunities to move in your career." So at that point, he then brought up that, "Hey, Warren [Wright] was" – "you know, he was not doing his job. He was a terrible store manager. He sucked. You know" -- "you know, a guy like that, he just" -- "you know, he won't be successful, but I believe that you can be successful with the right direction and the right motive." Then he started to go into – "I feel that you would be the best candidate for [store] 1517 because of, you know, your experience as a store manager, how you can lead people, and" – "and you can also grow your career."

Wills Depo. at 61:7–25. In other words, even on Wills's telling, Reinard was mentoring Wills and trying to help his career along. About two months after that conversation, in fact, Fleming emailed Wills to say that she'd "hear[d] [his] name mentioned several times from [Reinard] who was praising [his] performance." Email from Wills to Fleming and Fernandez (Dec. 16, 2018).

During all this time, Wills—whose race, it goes without saying, hadn't changed—never faced *any* adverse employment action. Instead, Wills was fired (as we've said) only *after* Walmart received (and then investigated) a veritable onslaught of complaints about Wills's misconduct towards women. And those complaints were very serious. In January 2019, for example, an anonymous associate called Walmart's global ethics hotline and reported that Wills was a bully. *See* Steele Decl. ¶ 3. Around that same time, Sears filed a written complaint because Wills "blew up" at her on the salesfloor. *See* Sears

Depo. at 11:6–12. In mid-March of that year, Dauta approached Steele and reported that Wills had (on more than one occasion) "yell[ed]" at her while "throw[ing]" products on the floor. *See* Defendant's SOF ¶ 23; Plaintiff's SOF ¶ 23 (not disputing this point); *see also* Dauta Global Ethics Complaint (Apr. 12, 2019). According to Dauta, there was "nothing but total anger in his voice." Dauta Global Ethics Complaint (Apr. 12, 2019). And, as we've seen, Dauta's account was fully corroborated by another employee. *See* Blizzard Global Ethics Complaint (Mar. 10, 2019) (corroborating Dauta's account).

In the coming months, more damaging evidence came to light. Martha Torres, for instance, told Steele at a grassroots meeting that she found Wills threatening when he was angry. *See* Steele Decl. ¶ 9. Several employees told Steele that Wills referred to the Store as "his store" and that he warned associates not to report complaints about him or his store to the outside market team. *Id.* ¶ 10. Steele also learned that Wills had recently yelled at Deppisch—in front of several customers—while throwing objects in rage. *See* Defendant's SOF ¶ 27; Plaintiff's SOF ¶ 27 (not disputing this point). Deppisch later explained that Wills "started scream[ed]" at her: "This is our money, our money[!]" Deppisch Depo. at 8:1–16. In her words: "He was cussing [at] me and it was just a very bad incident[.]" *Id.* at 8:24–25. Other coworkers—and customers—witnessed this incident. *See* Trivis Wilson Global Ethics Complaint (May 13, 2019) (explaining that a "customer" had "overheard" Wills screaming at Deppisch and "was highly upset" and "uncomfortable"); Lisa Curran Global Ethics Complaint (May 14, 2019) (stating that she "had three customers come over to [her] and [say] . . . this man was yelling at this older lady"). The incident was so humiliating, Deppisch later said, that she stepped down from her role at Walmart. *See* Deppisch Depo. at 9:24–10:9. Are we really prepared to say that Walmart cannot protect its female employees from abusive managers like Wills?

Walmart, to its credit, didn't just let things lie. It assigned an independent ethics investigator who launched a full-fledged inquest into Wills's misconduct, which concluded on June 20, 2019. *See* Schiller Depo. at 75:12–25. And it wasn't until June 28, 2019—just *eight days* after Schiller completed her investigation—that Walmart fired Wills. *See* Defendant's SOF ¶ 61; Plaintiff's SOF ¶ 61 (not disputing the date). This timeline—and, in particular, the close temporal proximity between the investigation's completion and Wills's termination—eviscerates Wills's "suspicious timing" contentions. *See, e.g., Hayes v. ATL Hawks, LLC*, 844 F. App'x 171, 180 (11th Cir. 2021) (finding no suspicious timing because, "while [the plaintiff's] termination may have been in close proximity to his complaints about [disparate treatment], it was also in close proximity to" acts of misconduct that were the "incidents for which the ATL Hawks assert he was terminated"); *Key v. Cent. Ga. Kidney Specialists PC*, 2021 WL 5321892, at *4 (11th Cir. Nov. 16, 2021) (concluding that, "[w]hen viewed in the light of the record as a whole—including Plaintiff's unprofessional conduct on the days immediately preceding Plaintiff's firing—Plaintiff's evidence of 'suspicious' timing is insufficient" to create a convincing mosaic).

*Second*, Wills never argues that Reinard's five "ambiguous statements" form any part of his "convincing mosaic," *see generally* MSJ Response; MSJ Sur-Reply—which is reason enough to put any such claim to rest, *see, e.g., Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."). Even if he had advanced this argument, though, we don't think that Reinard's five comments—crude though they may have been—establish a convincing mosaic here. To recap, those five comments are: (1) Reinard's suggestion (at the promotion lunch in September 2018) that Wills "needed to conform" as a black man, *see* Wills

62

Depo. at 54:21–55:10; (2) Reinard's remark, after Wills turned down the promotion the next day, that "[p]eople like you won't get an opportunity like this," *id.* at 56:12–17; (3) Reinard's comment (in November 2018), after Wills threatened to report their disagreement, that Wills should "look at what happened to Warren [Wright]," Plaintiff's SOF ¶ 18; (4) Reinard's observation, in February 2019, that he'd seen the black managers "walking together like a clique," Wills Depo. at 155:10–16; and (5) Reinard's statement (to Sanders and others in March or April 2019) that they should "work to communicate and build relationships with other store managers non-African-Americans within the market team," Sanders Depo. at 9:20–10:11. But all these comments were made *months* before Wills was fired, several of them are vague and susceptible of varying interpretations, and none of them had *anything* to do with the process of firing Wills. Indeed, two of the five were made in the context of offering Wills *a promotion*.

Faced with far worse, the Eleventh Circuit has found no mosaic of discrimination. Consider, for example, the court's decision in *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321 (11th Cir. 1998). In that case, the plaintiff's supervisor told her (a week before she was fired by her employer's personnel committee): "You black girls make me sick. Sometimes I feel like just hitting you in the head." *Id.* at 1322 n.10. Even though this unacceptable comment was made in relatively close proximity to the plaintiff's termination, the Eleventh Circuit held that, "as circumstantial evidence, the statements are not enough to establish a prima facie case" because "they were not associated with the events of the day leading to [the plaintiff's] discharge." *Id.* at 1322. Reinard's comments come nowhere close to the vitriol the Eleventh Circuit found wanting in *Jones*. If the supervisor's remarks weren't enough in *Jones*, in other words, Reinard's far more innocuous statements aren't nearly enough here. *See also, e.g., ATL Hawks*, 844 F. App'x at 181 (concluding that "scattered comments from [the

plaintiff's supervisor] about race" were "insufficient to establish a *prima facie* case" of a convincing mosaic, because they were from months before the plaintiff's termination).

*Third*, Wills devotes most of his energy to developing facts that would probably fall into the bucket of "systematically better treatment of similarly situated employees." So, for instance, he claims that Reinard deprived him of a bonus that other (white) employees received. *See* Plaintiff's SOF ¶ 36. But the evidence conclusively showed that Reinard had *no discretion* to award Wills a bonus—principally because, based on consumer reviews, Wills objectively didn't qualify for one. *See* Fernandez Depo. at 40:15–43:1 (explaining that the "exception process" is for "stores that do not receive any type of bonus, zero bonus," but that Wills's store "got a bonus" so he "automatically" did "not qualify for an exception process"). And, as we've suggested, even if Wills *could've* qualified for that bonus, there's nothing untoward about offering the extra bonus only to those managers who—unlike Wills—*hadn't* already received a profits-and-sales bonus for that year.

Wills also clings to Wright and Sanders's testimony, which (Wills says) shows that "Reinard held the black store managers to a different standard than the white store managers." MSJ Response at 8–10. But, as we've explained, Wright's testimony suggested that this differential treatment may have been based on factors *other* than race (like store size). *See* Wright Depo. at 26:17–27:4 ("The[ir] stores are much bigger. . . . And I was expected to keep distances, p[a]llets between aisles and maintain the same standard as a store that was, you know, twice as big as mine[.]"). And Sanders, for her part, *expressly disclaimed* any suggestion that Reinard treated black managers worse than white ones—at least for any reason having to do with race. As she explained: "I was promoted by Jimmy [Reinard], so I don't want to say that he had bias[.]" Sanders Depo. at 12:23–25.

Wills relies heavily on the fact that Reinard fired Wright, another black store manager. *See* MSJ Response at 9–10. But we know precious little about the circumstances of Wright's termination. All we really know is that Reinard "fired" Wright; that Wright appealed his termination to Fleming, contending that Reinard "was directly targeting, he was discriminating against me versus the other managers who spent more time in my store versus the other managers"; and that Walmart "overturned" his termination. Wright Depo. at 21:11–22:20.

But, for a few reasons, Wright's termination—mostly irrelevant, as we'll see—doesn't suggest that Reinard fired Wills (a different person with a very different work history) *because* he's black. *One*, Wright admitted that his "store was not up to standard[s]." *Id.* at 18:20–23. And the evidence supports that concession: In fact, a prior market manager (before Reinard joined) had disciplined Wright for failing to meet "facility or housekeeping standards." *Id.* at 46:21–47:18. Indeed, even after Reinard took over, Wright's store failed two separate safety inspections—both conducted by an independent, third-party vendor called Ecolab. *Id.* at 55:14–57:23 (describing those inspections). *Two*, Wright admitted that he'd never heard Reinard "say anything . . . about race," *id.* at 20:10–13, and that he had no reason to believe that Reinard was a "direct racist in that regard or with the intention," *id.* at 12:7–14. *Three*, we have no idea *why* Walmart overturned Reinard's decision. Wright testified that he was "not aware" what caused the reversal, *id.* at 43:10–19, and Wills has given us no reason to believe that race played any part in it. *Four*, Wills's termination—which occurred only after serious complaints of misconduct by several third parties—simply doesn't resemble Wright's.

Even when viewed in the light most favorable to Wills, then, there's just no evidence that Walmart generally (or Reinard specifically) systematically treated its similarly-situated white employees better than its black ones. In this respect, Wills hasn't—it's worth emphasizing—pointed to a *single*

65

white employee who *wasn't* fired despite a nagging propensity for shouting at female employees while angrily throwing merchandise in front of customers. And the fact is that the Eleventh Circuit has found no convincing mosaic *even in* the face of much *more* evidence. *See, e.g., Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1013 (11th Cir. 2019) (finding no convincing mosaic even though there were "no African-American people . . . employed in the Transportation Department").

*Fourth*, Wills's "pretext" contentions are unpersuasive. As we've said, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "The plaintiff must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007). An employee can do this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find all of [the employer's] reasons unworthy of credence." *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (cleaned up). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308.

Wills fails to do any of these things. He starts by trying to paint himself as (mostly) a good boss. He points, for instance, to Sears's testimony that, "[a]side from constantly being out of his normal character for the entire day [on which he yelled at her]," she "always looked up to Marcellus for the way that he speaks to people." Sears Depo. at 16:8–18. As Wills notes, Deppisch also added that: "Marcellus and I had a very good working relationship. In the five years we were together, we had one really bad day." Deppisch Depo. at 16:19–22. But there are many problems with this argument. For one thing, the Eleventh Circuit has time and again instructed us *not* to "sit as a super-

66

personnel department that reexamines an entity's business decisions." *Gogel*, 967 F.3d at 1149 (cleaned up). "No matter how medieval a firm's practices," the court has said, "no matter how high-handed its decisional process, no matter how mistaken the firm's managers, we do not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* In other words, whether Walmart was right to fire Wills for having a few "bad days" is simply irrelevant—especially when the "correctness" of that decision hinges on litigation testimony that Walmart was never presented with at the time of its investigation.

Wills next argues that "[a]ll three witnesses who made written statements testified that they did not do so until after the grassroots meeting and that they would not have done so but for being told to give statements by Tammy Steele." MSJ Response at 14. As we've already explained, however, the record conclusively belies this aspect of Wills's case. *See, e.g.*, Sears Depo. at 23:11–15 (explaining that she independently "wrote a statement" months *before* the meeting and "gave it to our then personnel coordinator"); Dauta Depo. at 16:25–17:2 ("Again, sir, under no circumstances did Tammy [Steele] or James [Reinard] ever ask me to write a statement. No they did not."). But here's the thing: Even if Wills were right about this, he'd still have failed to show that Steele impelled the employees to write those statements because *she* harbored some racial animus towards him. And, since it's undisputed that Steele is also black, any such claim would have been (in a word) implausible. *Shenzhen Kinwong*, 2021 WL 5834244, at *19 ("[T]o survive summary judgment, the non-movant must do more than simply show that there is some metaphysical doubt as to the material facts. It must come forward with some affirmative evidence to support its claim." (cleaned up)).

Wills rounds off his pretext arguments by claiming: "[I]t is hard to understand how Schiller could objectively conclude that Plaintiff was engaging in a pattern of gender discrimination." MSJ Sur-

Reply at 5–6. It's really not so hard. Wills is right that some of the written complaints reported that he had yelled at *other* employees—without distinguishing between men and women. *See, e.g.*, Lisa Curran Global Ethics Complaint (May 14, 2019) ("I also in the past have heard Marcellus raise his voice at other employees[.]"); Dauta Global Ethics Complaint (Apr. 12, 2019) ("I am not the only associate this has happened to."). But it was perfectly reasonable for Schiller to assume that those other employees *were* women—since three women (and only three women) had filed written complaints. In any event, Wills has provided *no* evidence that Schiller's conclusion—however factually flawed it may have been—was disingenuous or, to use the term of art, pretextual. And that's enough for us. *See, e.g.*, *Damon*, 196 F.3d at 1363 ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). But put all of that aside for a moment. Imagine, as Wills surmises, that Schiller was wrong to accuse him of targeting *women*. So what? He'd still be a store manager who engaged in repeated acts of gross workplace misconduct—misconduct directed, on this telling, at *both* men and women. It's hard to see how that helps—rather than hurts—his cause. And, of course, Wills has never suggested that these violent outbursts didn't occur—or that, for whatever reason, they didn't constitute fire-able offenses. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (explaining that, "where more than one legitimate reason is given, the plaintiff must rebut each one").

To bring our "convincing mosaic" discussion to a close, it's worth comparing our case to some others. We'll start with the Eleventh Circuit's decision in *Robertson v. Riverstone Communities, LLC*, 849 F. App'x 795, 799 (11th Cir. 2021)—a case that's nearly identical to ours. There, the plaintiff—Robertson—managed several properties at a mobile-home, property-management firm. *Id.* at 798. Robertson was black. *Id.* at 800. A few years into her tenure, a new supervisor made "racist and

abhorrent" remarks to Robertson. *Id.* at 802. For instance, the supervisor told Robertson that she'd won a Property Manager of the Year Award only "because she's black." *Id.* at 800. On another occasion, when one employee asked the supervisor to go to Atlanta to help with a struggling property, the supervisor responded: "There's too many f***ing n*****s in Atlanta[.] I'm not going there." *Id.* There was also testimony that the supervisor used the "n*****" word more than twenty times and that, on multiple occasions, she said she "hated n*****s[.]" *Id.* Within three months of the supervisor's arrival, Robertson was fired. *Id.* at 799. It was undisputed that the supervisor was one of the four people who had taken part in the decision to fire Robertson and that the supervisor had helped deliver the bad news. *Id.* The firm explained that Robertson was fired for "performance reasons"—including (1) decreased "occupancy numbers" and (2) Robertson's failure to timely "open[] two swimming pools." *Id.* at 798–99.

The Eleventh Circuit affirmed the district court's order granting summary judgment—finding that Robertson had failed to present a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 804 (cleaned up). Its reasoning is dispositive here. *First*, the court rejected Robertson's "suspicious timing" argument. *Id.* at 804–05. Although Robertson emphasized that "she was fired less than twelve weeks after [the supervisor] became her supervisor," the Eleventh Circuit stressed that Robertson's performance had "dip[ped] dramatically"—and so, it could not conclude, given these "additional facts," that the "timing of Robertson's termination is suspicious." *Id.* That logic applies with even more force here. Unlike the supervisor in *Robertson*—who had managed the plaintiff for just three months—Reinard became Wills's supervisor *a whole year* before he was terminated. And, more so than the "poor performance"

at issue in *Robertson*, Wills's repeated mistreatment of his subordinates supplied Walmart with an objectively legitimate basis for his termination.

*Second*, the Eleventh Circuit cast aside Robertson's reliance on her supervisor's "racist remarks." *Id.* at 806–07. While recognizing that the supervisor's comments "reflect[ed] an inexcusable and deep-seated animus against Black people," the panel found that the statements, standing alone, weren't enough. *Id.* Why? Because (1) the supervisor "was not the primary, or even ultimate, decisionmaker"; (2) there was "no evidence that the other decisionmakers were at all influenced by racial bias"; and (3) the supervisor's statements "occurred outside the context of and well before the decision to fire Robertson." *Id.* at 807. The same is true here. Reinard, in fact, was even *further* removed from the decision-making process—a process that, as we've seen, started with Steele, continued with Perez and Haberer, and culminated in an independent ethics review by Schiller. The ultimate decisionmaker (Jacqueline Perez) testified that, although she "took the input and suggestions" from Reinard (who was "in line with termination" based on "the substantiation from ethics"), *she* terminated Wills "because of an ethics investigation and because of the way that he was treating his associates, it was deemed gross misconduct, and the fact that he was discriminating against female associates." Perez Depo. at 14:7–13, 15:15–24. On top of all that, Reinard's remarks were made well before—and outside the context of—the decision to fire Wills. As in *Robertson*, then, no reasonable jury could discern from these facts a "convincing mosaic" of race discrimination.

The Eleventh Circuit's decision in *Williams v. Housing Opportunities for Persons with Exceptionalities*, 777 F. App'x 451 (11th Cir. 2019), is also instructive. The plaintiff in that case, Williams—who was black—worked as a direct-care provider for people with special needs. *Id.* at 452. One day, the provider's executive director asked him to cover a shift. *Id.* Williams refused. *Id.* The executive director

"responded to Williams with a profanity-laced tirade lasting two or three minutes," in which she said, among many other things: "I can't stand your black ass." *Id.* Williams was then fired. *Id.* The Eleventh Circuit affirmed the district court's decision to grant the employer's motion for summary judgment. The court concluded that "a reasonable jury could not find that [the executive director] fired him because of his race based only on that statement because its content bears no relation to the termination decision." *Id.* at 455. It also pointed out that "other evidence in the record counsels against a finding" of racial discrimination—including that the director "filled [Williams's] position with people of the same race." *Id.* Walmart's summary-judgment motion is, of course, much stronger. As in *Williams*, Wills's spot was ultimately filled by someone of Wills's same race—cutting strongly against any claim of discrimination. More than that, though, Reinard's statements—when compared to the director's in *Williams*—were far *less* connected to the termination decision. And Wills's misconduct towards his female subordinates was *both* egregious *and* very closely linked to his firing. *Williams*, in sum, lends further support to our conclusion that Wills has fallen well short of establishing a "convincing mosaic" here.

### c. The Cat's-Paw Problem

In a sense, we've buried the lede. All of Wills's discrimination proof (such as it is) revolves around Reinard's conduct. And, up to this point, we've just assumed that Reinard's animus—however defined—*would* suffice to show that Wills was fired *because of* his race. But Reinard didn't fire Wills. Instead, Walmart's Global Ethics Department recommended that Wills be fired after *it* reviewed the written complaints that *Steele* had collected. *See* Schiller Depo. at 48:6–9 (Schiller explaining that she "was the person who provided the recommendation to terminate Marcellus based on the behaviors of -- brought forth by some of the associates in his store"). And Perez adopted Schiller's

recommendation. *See* Perez Depo. at 21:11–13 ("I did rely on my ethics department as the director of ethics to provide a recommendation in regards to next steps."). How, then, are Reinard's attitudes (whatever they are) relevant to this case? That's where the "cat's paw" theory comes in.[23] As we'll see, even if Reinard's behavior supplied direct or circumstantial evidence of *his* discriminatory intent (they don't), none of that would show that Reinard's animus *caused* Wills's termination.

To understand why, we need to look back at some history. Our Circuit has long applied the cat's-paw theory to cases of race- or gender-based discrimination when "the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation." *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). In other words, the court has said that "causation may be established" if the biased "recommender is using the decisionmaker as a mere conduit, or 'cat's paw,' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (cleaned up). At the same time, these early decisions intimated that the final decisionmaker may be inoculated from imputation where the decisionmaker "independently investigat[ed] the complaint against the employee." *Id.*; *see also Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) ("[A] non-decisionmaking employee's discriminatory animus may

---

[23] The Supreme Court has said this about the theory's origins:

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011).

be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct.").

The Supreme Court weighed in on the cat's-paw theory in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). The plaintiff there had sued under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). *Id.* at 415. That statute—prohibiting discrimination against veterans—is "very similar to Title VII" in that both laws bar certain protected traits from being used as a "motivating factor" in adverse employment actions. *Id.* at 416–17. In analyzing the viability—and scope—of the plaintiff's cat's-paw theory, the Court focused on USERRA's language. *Id.* at 417 ("The central difficulty in this case is construing the phrase 'motivating factor in the employer's action.'"). After a deep dive into the statute's text and purpose, Justice Scalia—writing for the Court—explained: "[I]f a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422. The Court also rejected the proposition that the "decisionmaker's independent investigation" will always "negate the effect of the prior discrimination." *Id.* at 420–21. It did, however, indicate that the causal chain *will* be broken if the final decisionmaker "determine[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*

For what it's worth, we offer a few observations on the Eleventh Circuit's application of *Staub* in the context of motivating-factor statutes (like Title VII). For one thing, the Eleventh Circuit hasn't squarely resolved—in any *published* decision—whether *Staub*'s discussion of imputation transfers over

from USERRA to Title VII (or other motivating-factor statutes).[24] We're not too concerned about this lacuna, though, because the Supreme Court explicitly based its decision—in *Staub*—on USERRA's text, which (it noted) is strikingly similar to Title VII's. Given this, we shouldn't have been too surprised when, just last year, the Eleventh Circuit applied *Staub*'s standard to a Title VII claim— albeit in an unpublished decision. *See Blash v. City of Hawkinsville*, 856 F. App'x 259, 266 (11th Cir. 2021) (explaining that *Staub* applies "[w]here the statute giving rise to the cause of action only requires proof that the employee's protected characteristic was a 'motivating factor' in the adverse employment decision").[25] For another, our Circuit has "not addressed the viability of the independent-investigation defense in a race-discrimination case since the Supreme Court's decision in *Staub*." *Anterio v. City of High Springs*, 762 F. App'x 891, 899 n.1 (11th Cir. 2019). Again, though, the Supreme Court was pellucid on this issue in *Staub*: For claims asserted under a motivating-factor statute, an independent investigation will not *always* provide a complete defense.

---

[24] *Cf. Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018) ("Because *Staub* considered the cat's paw theory in the context of USERRA, it did not directly overrule precedent applying the theory in the context of other statutes.").

[25] Oddly, in some decisions, the Eleventh Circuit has continued to rely on our (old) "mere conduit" theory—even though that theory appears to have been abrogated by *Staub*. *See, e.g.*, *James v. City of Montgomery*, 823 F. App'x 728, 734 (11th Cir. 2020) ("Under a 'cat's paw' theory of liability, the discriminatory animus of a non-decisionmaker can be imputed to a neutral decisionmaker that acted as a mere conduit."); *Cooper v. Ga. Dep't of Transp.*, 837 F. App'x 657, 664 (11th Cir. 2020) (concluding that the plaintiff could not "prevail on a 'cat's paw' theory of liability" because the final decisionmaker "was not acting as a mere conduit to give effect to the discriminatory animus of a recommender"); *Monds v. Quitman Ga.*, 767 F. App'x 750, 754 n.2 (11th Cir. 2019) (applying the "mere conduit" test and explaining that "the cat's paw theory applies only when actual decision-makers blindly rely on the recommendation of a discriminatory non-decision-maker"). Obviously, if this test applies, then Wills's cat's-paw claim necessarily fails, because there's no evidence that, in launching an independent ethics probe into Wills's misconduct, Walmart used Steele, Schiller, *and* Perez as "mere conduits" for Reinard.

All that said, the Eleventh Circuit *has* considered *Staub*'s application under statutes that incorporate but-for (rather than motivating-factor) causation. Its first foray into this arena came in *Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013). There, the court observed that the Age Discrimination in Employment Act (the "ADEA"), unlike USERRA, deploys a but-for causation standard. And this distinction, the court said, matters:

> Because the ADEA requires a "but-for" link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a "motivating factor" in the adverse employment decision, we hold that *Staub*'s "proximate causation" standard does not apply to cat's paw cases involving age discrimination.

*Id.* at 1336.

Veering from the motivating-factor standard, then, the *Sims* Court adopted the following cat's-paw test in cases brought under the ADEA: "[T]o prevail, [the plaintiff] must prove that [the person's] animus was a 'but-for' cause of, or a determinative influence on, [the decisionmaker's] ultimate decision." *Id.* at 1337. In doing so, the court "follow[ed] the same holding by the Tenth Circuit in *Simmons*." *Id.* at 1336. In *Simmons*, the Tenth Circuit had provided some helpful guidance on this thorny question. As it explained:

> To illustrate, a supervisor's animus might be a "but-for" cause of termination where, for example, the biased supervisor falsely reports the employee violated the company's policies, which in turn leads to an investigation supported by the same supervisor and eventual termination. Or the biased supervisor may write a series of unfavorable periodic reviews which, when brought to the attention of the final decision-maker, serve as the basis for disciplinary action against the employee. But where a violation of company policy was reported through channels independent from the biased supervisor, or the undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination, the plaintiff's [race] may very well have been in play—and could even bear some direct relationship to the termination if, for instance, the biased supervisor participated in the investigation or recommended termination— but [race] was not a determinative cause of the employer's final decision.

*Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 950 (10th Cir. 2011). And, recently, in *Ziyadat v. Diamondrock Hospital Co.*, 3 F.4th 1291 (11th Cir. 2021), the Eleventh Circuit applied the but-for cat's-paw test in a § 1981 case: "When the intentionally discriminating employee does not herself have decisionmaking authority, the plaintiff must plausibly allege that the discriminating employee's racial animus (1) was intended to cause and (2) did cause the contractual injury." *Id.* at 1297. The court reiterated that, "[i]n a cat's-paw case, we merely apply the operative causation standard—whatever it may be—to the actions of the lower-level employee." *Id.* at 1298.

Which brings us to our case—anchored, as we've said, to § 1981 and the FCRA. Which cat's-paw test should we apply? Well, the Eleventh Circuit has repeatedly indicated that discrimination claims brought under § 1981, the FCRA, and Title VII should be analyzed under the *same* framework. *See, e.g.*, *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 n.6 (11th Cir. 2015) ("[T]he same analytical framework and proof requirements that apply to employment discrimination claims under Title VII also apply to discrimination claims under Section 1981 . . . and the FCRA[.]"); *Lewis v. Sch. Bd. of Palm Beach Cnty.*, 850 F. App'x 674, 678 (11th Cir. 2021) ("Claims brought under the FCRA and § 1981 are subject to the same legal framework as Title VII claims."); *Edmond v. Univ. of Miami*, 441 F. App'x 721, 723 (11th Cir. 2011) ("Discrimination claims under § 1981 and the FCRA are governed by the same requirements of proof and the same analytical framework applicable to Title VII claims.").

But, as our discussion so far makes clear, that can't be right. As we've seen, § 1981 claims and Title VII claims have *different* causation requirements. A plaintiff pursuing a § 1981 claim must prove but-for causation, *see Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("All the traditional tools of statutory interpretation persuade us that § 1981 follows the usual rules, not any exception. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it

would not have suffered the loss of a legally protected right."), whereas a plaintiff operating under Title VII must show that the protected trait was a motivating factor in the adverse employment decision, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1084 (11th Cir. 1996) ("[T]he plaintiff in a Title VII action prevails whenever he or she proves that one of the delineated characteristics was a 'motivating factor' behind a particular employment decision, even if there were other, even legitimate, factors motivating that decision as well."). Wills has brought a § 1981 claim, not a Title VII claim, so the but-for causation standard set out in *Sims* and *Ziyadat* certainly applies to *that* count.

But what about Wills's FCRA claim? What's the causation standard there? The parties don't address that question. Nor, so far as we can tell, have Florida's state courts. There's some reason, though, to think that FCRA-discrimination claims ought to be analyzed under the motivating-factor standard. That's because Florida's courts *have* held that the FCRA "is patterned after" Title VII—and so, "the Florida statute will be given the same construction as the federal courts give the federal act." *Carsillo v. City of Lake Worth*, 995 So. 2d 1118, 1119 (Fla. 4th DCA 2008). And, even before the 1991 amendments to the Civil Rights Act, the Supreme Court had held that a Title VII plaintiff need not prove but-for causation—had held, in other words, that it's enough for a Title VII plaintiff to show that discrimination was a "motivating factor" in the employer's decision. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989). In some respects, though, this discussion is mostly academic—at least as applied to our facts—because Wills's cat's-paw theory fails under *either* standard.[26]

---

[26] We'd note that Wills has treated his § 1981 and FCRA claims identically—and so, he's likely forfeited any argument that his FCRA claim should survive under some more lenient proximate-cause standard. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances").

*First*, Wills's theory fails under *Staub*'s motivating-factor standard. As we've said, in the context of a motivating-factor statute, Wills must show that (1) Reinard "perform[ed] an act motivated by [racial] animus that is *intended* by [him] to cause an adverse employment action," and (2) "that act is a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 1194. Wills fails at both prongs. On the first prong, Wills points to two of Reinard's actions that, he says, were motivated by racial animus and an intent to have him fired: (1) "convening the grassroots meetings" and (2) providing his "input and suggestions" to Perez. MSJ Sur-Reply at 4. But there's no evidence that Reinard convened the grassroots meetings. To the contrary, *all the evidence* shows that Reinard did *not* convene those meetings. *See* Steele Depo. at 49:15–23 ("Q: Do you know if Jimmy [Reinard] asked . . . to conduct this grassroots meeting? A: No, Jimmy did not ask . . . to conduct the grassroots meeting."). Steele did. *See* Steele Decl. ¶ 8 ("I initiated Grassroots meetings at Store 5911[.]"). And there's no evidence that Steele—who's black herself—harbored any racial animus (let alone any racial animus against Wills). But here's the rub: Even assuming that Reinard did either of these things, there's no evidence that he took those actions *because of* racial animus. *See, e.g.*, Perez Depo. at 15:15–24 (explaining that Reinard's input was "[b]ased off of the substantiation from ethics"—an ethics investigation that, of course, stemmed from the way Wills had treated his female subordinates).

On the second prong, Wills has failed to establish proximate causation. That's because Schiller (who led the Global Ethics review) and Perez (who made the ultimate decision) "determine[ed] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421. As a result, there's no "direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 419 (cleaned up). Indeed, Schiller testified that she made her decision—not because of anything having to do with Reinard—but because of the disturbing (and substantiated) complaints

from Wills's employees. Schiller Depo. at 84:9–11 ("I read the statements and made a determination based on the behaviors they described to have experienced from Marcellus."). Perez likewise said that she based her decision on the results of the independent ethics investigation. *See* Perez Depo. at 11:19–23 ("We proceeded with termination as a result of an ongoing investigation in his building in which he was discriminating against associates and specifically harassing or discriminating against female associates in his building."). As we've seen, Wills has *never* denied that he engaged in the workplace misconduct that led Walmart to fire him. And that's sufficient to break the causal chain. *See, e.g.*, *Holley*, 845 F. App'x at 890 ("[T]here is no proximate cause—and therefore can be no liability—if the adverse action is entirely justified apart from the biased supervisor's recommendation."); *Duncan*, 734 F. App'x at 640 (finding no imputation where the "ultimate decision to demote [the plaintiff] was 'entirely justified' by the undisputed evidence in the record"); *Anterio*, 762 F. App'x at 899 (finding no cat's paw where the "ultimate decision to terminate [the plaintiff] was 'entirely justified' by the undisputed evidence").

    *Second*, Wills's cat's-paw theory falls short under the but-for-causation standard the Eleventh Circuit enunciated in *Sims*. As we've said, under *Sims* and its progeny, Wills "must prove that [Reinard's] animus was a 'but-for' cause of, or a determinative influence on, [Perez's] ultimate decision." *Sims*, 704 F.3d at 1337. Wills can't show that here. Reinard didn't call the grassroots meetings. *See* Reinard Depo. at 50:6–13 ("Q: While Marcellus was out on leave; did you have anything to do with setting up a grassroots meeting with Associates? A: Tammy [Steele] did that. Q: Did you ask her to? A: No, she asked me to partake."). He didn't prompt the written complaints. *See, e.g.*, Dauta Depo. at 16:25–17:2 ("Again, sir, under no circumstances did Tammy [Steele] or James [Reinard] ever ask me to write a statement. No they did not."); Deppisch Depo. at 18:8–14 (explaining that Steele

told her to write a complaint "[f]or [her] protection"). He didn't conduct the ethics review. *See generally* Schiller Depo. Nor could any reasonable jury find that he did the things he *didn't* do with any kind of racial animus.

One final point on but-for causation: Perez testified that she "took the input and suggestions" from Reinard—who, "[b]ased off of the substantiation from ethics, . . . was in line with termination." Perez Depo. at 15:15–24. Even here, however, the evidence is that Reinard approved of the termination decision only *after* the ethics investigation had uncovered Wills's gross misconduct. In any case, there's no evidence that Reinard acceded to Perez's determination because of some racial animus. To the contrary, Perez was clear that his acquiescence was "[b]ased off of the substantiation from ethics[.]" And there's no evidence that Perez would've been willing to keep Wills on if, for whatever reason, Reinard had *opposed* his termination. Walmart, in short, "fired [Wills] for its own unbiased reasons that were sufficient in themselves to justify termination." *Simmons*, 647 F.3d at 950; *see also, e.g.*, *Sims*, 704 F.3d at 1337 (finding no cat's paw at summary judgment where, as here, there were separate "evaluations," the decisionmaker exercised his "own independent judgment," and others (besides the allegedly racist supervisor) shared the "opinion" that the plaintiff's "performance" was inadequate).

*       *       *

To sum up: No reasonable jury could find evidence of direct discrimination. No reasonable jury could find evidence of circumstantial discrimination. And no reasonable jury could find—even if Reinard's actions *were* motivated by animus—that Reinard's animus (as it were) *caused* Wills's termination.

### 2.   The Race-Retaliation Claims

Wills glosses over his retaliation claim. *See generally* MSJ Response. In fact, he never even begins to explain how he's made out a *prima facie* case of retaliation. *Id.* Instead, his discussion consists (mostly) of this single sentence: "Defendant retaliated against Plaintiff for complaining about said discrimination[.]" *Id.* He only really discusses retaliation—almost as an afterthought—in his sur-reply. *See* MSJ Sur-Reply at 2. By then, however, Walmart had no opportunity to respond to Wills's arguments—which is why we'll treat those arguments as forfeited here. *See, e.g., In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 123 n.8 (2d Cir. 2021) ("Although Defendants state for the first time in their sur-reply that Plaintiffs failed to satisfy the first two . . . factors, we consider this delayed argument to be forfeited."); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1212 (9th Cir. 2016) ("We note that Plaintiffs also raised the argument . . . for the first time in a sur-reply. That untimely submission waived the argument.").

Wills's retaliation claim also fails on the merits. "Where, as here, there is only circumstantial evidence of retaliation, we use the burden-shifting framework of *McDonnell Douglas*[.]" *Tyler v. Kia Motors Mfg. Ga., Inc.*, 702 F. App'x 945, 949 (11th Cir. 2017). This test should look familiar. *First*, the plaintiff must satisfy his *prima facie* case of retaliation by showing: "(1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel*, 967 F.3d at 1134 (cleaned up). *Second*, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* at 1135. *Third*, "[i]f the employer produces such

a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask [retaliatory] actions." *Id.* (cleaned up).

We'll assume that Wills has met his burden of establishing a *prima facie* case, even though he never addresses Walmart's contention that "without evidence that [the plaintiff] verbally complained of race discrimination—*with explicit allusion to race*—[ ]he has not established that h[is] verbal complaints were protected activities." MSJ at 10 (quoting *Lanier v. Bd. of Trustees of Univ. of Ala.*, 2014 WL 657541, at *5 (N.D. Ala. Feb. 20, 2014)). Even with this assumption, though, Wills loses. Walmart, after all, has proffered legitimate, non-discriminatory reasons for its actions. To name a few: (1) Wills berated his coworkers; (2) he humiliated female subordinates in public; and (3) he threatened to retaliate against employees who reported him. And Wills has failed to show that *any* of those reasons were pretextual or that Walmart's true reason was retaliation.

*      *      *

After careful review, we **ORDER AND ADJUDGE** as follows:

1. Walmart's Motion for Summary Judgment [ECF No. 53] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3. The Clerk of Court shall **CLOSE** this case.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 21st day of March 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record